**CIRCLE J DAIRY, INC., Appellee and Cross-Appellant,**

v.

**A.O. SMITH HARVESTORE PRODUCTS, INC., and Southern Harvestore Systems, Inc., Appellants and Cross-Appellees.**

**Nos. 85–1505, 85–1536 and 85–1565.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 11, 1985.

Decided May 12, 1986.

Steven B. Davis, Harrison, Ark. for A.O. Smith Harvestore.

William R., Still, Jr., Fayetteville, Ark., for Southern Harvestore.

John Elrod, Siloam Springs, Ark., for Circle J Dairy, Inc.

Before ARNOLD and WOLLMAN, Circuit Judges, and REGAN,* Senior District Judge.

ARNOLD, Circuit Judge.

This negligence case was brought by Circle J Dairy, owner of a dairy farm in Northwest Arkansas, against A.O. Smith Harvestore Products, Inc. (AOSHPI) and Southern Harvestore Inc. (Southern), who are respectively manufacturer of and dealer in a system, known as Harvestores, for storing, ensiling, and feeding agricultural feedstuffs to livestock. In this appeal, defendants challenge a jury verdict of $500,000 in favor of the plaintiff, who alleged it was damaged by AOSHPI's negligence in design and Southern's negligence in phasing in the use of the system and in formulating feed rations for Circle J's herd. The jury, which apportioned fault at 26 per cent. to AOSHPI and 74 per cent. to Southern, also found that Southern and AOSHPI, through Southern as its agent, were guilty of deceit.

Defendants argue that the judgment should be reversed because the District Court[1] refused to instruct the jury on comparative fault; denied motions for new trial on grounds that the awards for lost milk production and permanent damage to the herd were based on insufficient evidence; and erred in submitting the issue of deceit to the jury and also in admitting certain testimony as expert under Fed.R.Evid. 702.

We affirm. Although the District Court's refusal to submit the issue of comparative fault to the jury was error, its damage instruction, which directed the jury to reduce any award to plaintiff by the amount which the plaintiff might have "avoided through the exercise of ordinary care," served essentially the same function as would have been fulfilled by an appro-

---

* The Hon. John K. Regan, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Hon. H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

priate comparative-fault instruction. As for the issues of lost milk production and permanent damage to the Circle J herd, we hold that plaintiff has presented sufficient evidence of such damage to support the jury's verdict. Finally, we agree with defendants that the question of deceit should not have gone to the jury; however, because the District Court granted defendants' motion for a judgment notwithstanding the verdict, and plaintiff's minimal deceit evidence was relevant to its negligence claim, this error was also harmless.

## I.

In 1981, Ira Thurman, the owner and operator of Circle J Dairy,[2] leased two Harvestores[3] to be used in the feeding of his 300–plus head dairy herd. The Harvestore system, whose workings were addressed at length during the trial, was designed to prevent stored feed from fermenting beyond the point of its peak nutritional value, supposedly by limiting the amount of oxygen that can reach the feed. Both the mechanics of storage in the Harvestore and the system's procedure for feeding cattle represented major changes for Circle J; previously, Mr. Thurman fed the animals a mixture of alfalfa hay and dairy pellets as they were being milked in the dairy parlor.

The Harvestore system went on line at Circle J on 31 October 1981, and almost immediately there was a marked drop in milk production. Mr. Thurman, who was out of state for a family wedding when the changeover took place, ordered the animals put back on their old feed, and production returned to its previous daily level of approximately 40 pounds of milk per cow. Eventually, the Harvestore system was reintroduced.

Over the next two years, Mr. Thurman experienced a variety of problems with the system, which allegedly caused a second, permanent drop in milk production, to the point that the cattle, considered as a herd, lost their value as dairy animals. Plaintiff claimed the system was negligently designed by AOSHPI so that feed would spoil rather than be preserved; that Southern employees acted negligently in the manner in which they first set up the Harvestore system at Circle J and later advised Mr. Thurman to operate it; and that both AOSHPI and Southern were negligent in the development of feed rations for the Circle J herd.

In response, defendants argued that if there had been negligent management of the Harvestore system at the Circle J, it was the fault of Mr. Thurman and not AOSHPI or Southern employees. They pointed out that the herd was significantly increased in size at the time the Harvestores were first used, which could have caused a drop in production. To counter the testimony of plaintiff's experts, who had only bachelor's degrees and practical experience,[4] defendants' witnesses, most with doctoral degrees, testified that the Harvestore system worked as it was supposed to, that there was no permanent harm to the Circle J herd, and that any damage was attributable to plaintiff's mismanagement.

The case went to the jury on these negligence theories; the jury was also asked to determine if Southern employees, acting as agents of AOSHPI, were guilty of deceit in their dealings with Mr. Thurman. A plaintiff's verdict was returned on all questions; the District Court, however, granted a judgment n.o.v. on the deceit issue, while permitting the $500,000 verdict to stand. This appeal followed.

## II.

■ This case was submitted on interrogatories, and the jury was asked to ap-

---

**2.** Circle J is the named plaintiff in this case; however, because some of the owner's actions are directly at issue, Mr. Thurman and his farm will be referred to interchangeably.

**3.** Circle J later obtained a third, used Harvestore from Southern.

**4.** Plaintiff did introduce the deposition testimony of Dr. Larry Price, a veterinarian employed by AOSHPI as a consultant. Dr. Price also testified in person for defendants.

portion responsibility between the defendants. However, because the District Court did "not believe that there is a jury question in relation to contributory or comparative negligence," Tr. 1065, it refused to instruct the jury to reduce plaintiff's award by the amount of its own negligence or other breach of duty. This was error. Under Arkansas law, the fault of a plaintiff is to be compared with that of a defendant, and plaintiff's recovery is then reduced in proportion to his or her responsibility for the injury. Ark.Stat.Ann. § 27–1763 *et seq.* Circle J claimed the herd was injured as a result of faulty design of the Harvestore silo, which plaintiff says spoiled the ensiled feed, as well as by negligent planning by Southern. Defendants responded with sufficient evidence of owner mismanagement at the dairy—including the Thurmans' trip to Rhode Island at the time the Harvestore system went on line, the abrupt switch from pellets to silage, the quality of silage used at the dairy, the increase in the size of the herd, and Ira Thurman's lack of record-keeping—to warrant a fault comparison by the jury.

Rather than instruct the jury on comparative fault, however, the District Court asked the jury first to apportion the negligence, if any, of the defendants and then later to "[s]tate the amount of damages sustained by plaintiff which you find could not have been avoided through the exercise of ordinary care." Tr. 1069. Moreover, while charging the jury, the District Court not only gave a mitigation instruction[5] but also twice described the function of the damages interrogatory.[6]

[W]e're telling you that if you find Mr. Thurman had damages and that there was some liability on the part of the defendants, but that you also find that Mr. Thurman *contributed* to those, you'll give him only that portion of his damages which was not caused by his *contribution.*

*Id.* at 1061 (emphasis added).

[Y]ou're to place a figure in there which represents the amount you believe Mr. Thurman has been *damaged not caused by his own actions.*

*Id.* at 1069 (emphasis added).

A district court has considerable discretion in the style and wording of jury instructions, so long as the charge as a whole fairly and adequately states the law. *Monahan v. Flannery,* 755 F.2d 678, 681 (8th Cir.1985). Therefore, in a situation where a jury has been instructed erroneously, an appellate court should consider the charge in its entirety, *Chohlis v. Cessna Aircraft Co.,* 760 F.2d 901, 904 (8th Cir.1985), and reverse only if a substantial right of the appellant has been affected. Fed.R.Civ.P. 61. In a case such as this, a proper comparative-fault instruction would have told the jurors that:

[If] you should find that the occurrence was proximately caused by negligence of both [plaintiff] and [defendant], then you must compare the percentages of their negligence.... If the negligence of [plaintiff] is of less degree than the negligence of [defendant], then [plaintiff] is entitled to recover any damages which you may find he has sustained as a result of the occurrence after you have reduced them in proportion to the degree of his own negligence.

AMI 2102, Arkansas Model Jury Instructions (2d ed. 1974).[7]

---

5. The jury was told that:
 in fixing the amount of money which will reasonably and fairly compensate it, you are to consider that a person whose business is damaged must use ordinary care to minimize existing damages and to prevent further damages and to avoid damages.
 Tr. 1056.

6. The District Court provided this explanation because, in closing argument, plaintiff's counsel

misdescribed the kind of answer the jury was to give to the damages interrogatory.

7. Since this case was submitted on interrogatories, the Circle J jury would not even have been told this much about comparative fault; the jurors simply would have been asked to apportion fault for the alleged injuries among the three parties.

Defendants suggest that because the jury was asked to apportion responsibility equaling 100

A comparison of the damages instructions given in this case and that suggested by the AMI drafters shows that the Circle J jury was directed to go through the same deliberative process as would a jury that had been instructed properly on comparative fault. While we would be inclined to hold that the damages instruction and interrogatory alone served this purpose, the additional damages explanation given by the District Court make the present case clearcut. This jury undoubtedly knew that before awarding any damages, its responsibility was to "compar[e] the fault chargeable to [the] claiming party with the fault chargeable to the party or parties from whom the claiming party seeks to recover damages." Ark.Stat.Ann. § 27–1764.[8]

As support for their argument that the instruction given here did not sufficiently direct the jury to its duty to compare the fault of the parties, the defendants cite *Beevers v. Miller*, 242 Ark. 541, 414 S.W.2d 603 (1967). That case held that "[e]ven if the court's general instructions could be said technically to have covered the matter in a general way, it is error to refuse to give a specific instruction correctly ... unless it appears that prejudice has not resulted." *Id.* at 547, 414 S.W.2d at 607. *Beevers* and other Arkansas cases, see, *e.g.*, *Holiday Inns, Inc. v. Drew*, 276 Ark. 390, 635 S.W.2d 252 (1982), do set a high standard for compliance with the proper form of jury instructions in order to avoid prejudice to the parties. This, however, is a federal court, and the issue of harmless error is to be decided by federal standards of substantial prejudice. Second, in this case at least, the detailed manner in which the District Court[9] explained the damage instruction surely met even the exacting standards of *Beevers*. We hold, therefore, that the Circle J jury was adequately instructed on the issue of comparative fault.

### III.

The bulk of plaintiff's requested damages—$462,658—were for the milk profits Mr. Thurman claimed were lost between October 1981 and November 1984; in addition, plaintiff asked for the difference between the fair market value of the herd in 1981 and in 1984 and for the cost of the remaining feed purchased by Circle J and supposedly spoiled because of the Harvestore design. Defendants argue that there was not sufficient evidence to support the award for either lost milk or permanent damage to the herd, and challenges the admission of testimony on permanent damage by plaintiff's witness Larry Scott. We disagree, and find sufficient evidence to support the jury's verdict.[10]

---

per cent. between AOSHPI and Southern, no consideration could have been given to plaintiff's blame. However, the interrogatory clearly instructs the jury to "us[e] 100% to represent the total negligence of the *defendants*" (emphasis added), not the total negligence contributing to the injury.

8. Arkansas comparative-fault law permits a plaintiff to recover only when his or her negligence is less than that of the defendant; equal or greater fault on plaintiff's part precludes recovery. Ark.Stat.Ann. § 27–1765. The instruction issue would be hard to resolve in plaintiff's favor had Mr. Thurman been awarded an amount representing half or less than half of his requested damages. That was not so here. The plaintiff asked for $684,962 in damages and was awarded $500,000, or approximately 77 per cent. of the claim. This appears to rule out the possibility that the jurors considered any fault on Mr. Thurman's part equal to or exceeding that attributable to defendants.

9. Several Arkansas cases have rejected the argument that incomplete jury instructions were cured by counsel's explanation of the jury's task during closing argument. *Holiday Inns, Inc. v. Drew, supra,* 276 Ark. at 397, 635 S.W.2d at 256; *St. Louis & S.F.R. Co. v. Crabtree,* 69 Ark. 134, 138, 62 S.W. 64, 65 (1901). While it is quite true that "jurors are not required to take their law from counsel," *St. Louis & S.F.R. Co.,* 69 Ark. at 138, 62 S.W. at 65, here the court itself supplemented and ultimately cured its own incomplete instruction.

10. Defendants also claim the District Court abused its discretion by failing to order remittitur on the issue of lost profits, on the ground that they were prejudiced by the speculative evidence presented by plaintiff and thereby subjected to an excessive award. We hold that there was sufficient evidence; moreover, "this court has consistently applied the following standard: [']Excessiveness of a verdict is basically and should be, a matter for the trial court.

The defendants' allegations that there was no evidence that the cattle suffered permanent injury from lactic, or rumen, acidosis raise two intertwined problems. First is whether Mr. Scott was qualified to give an expert opinion on the question of permanence. Second is the quality of the data on which Mr. Scott based that opinion. Also at issue, and connected to the question of lost milk, is the Circle J's failure to keep records, and, as a result, the ability of either experts or jury plausibly to find permanent damage based on Mr. Thurman's personal recollections.

 Mr. Scott is employed by and part owner of a soil and feed testing service in Loveland, Colorado, which he helped establish in 1957, just after he received his bachelor's degree in animal nutrition from Colorado State University. Approximately one-half of the Triple S Labs' work involves dairy cattle. There was no debate at trial about Mr. Scott's ability to give expert testimony on the question of feed formulation and related nutritional issues; however, defendants did challenge the witness's competence to speak expertly to permanent damage to the cattle, and the District Court initially appeared reluctant to qualify Mr. Scott on that subject. Nevertheless, after additional voir dire by both plaintiff and defendants, the court permitted the witness to testify. That decision was within the broad discretion of the trial court. Mr. Scott, though not a veterinarian and without advanced degrees, had significant practical experience with feed-related health problems in dairy cattle.[11] Rule 702 of the Federal Rules of Evidence does not rank academic training over demonstrated practical experience, and we credit a jury, when evaluating the evidence in a case, with the ability also to consider the background and credentials of the expert witnesses who testified before it.

 Rather than exclude Mr. Scott's testimony on permanent damage, the District Court held that the "very legitimate questions" raised by defense counsel to that testimony "go ... not to whether or not he's an expert, but whether he has any real good believable basis for giving his opinion." Tr. 612. We agree that this is the primary question.

Mr. Scott testified that while the lactic acidosis suffered by the herd as a result of the abrupt switchover to silage did not have a permanent effect on the cattle, *id.* at 614, "there was permanent damage [to the herd] that occurred from the continued use of the ensiled feeds." *Id.* According to the witness, the Harvestore structure allowed oxygen to corrupt the stored silage in such a way as to cause, along with an overformulated feed ration developed by defendants, lactic acidosis and permanent damage. He based this opinion on his chemical analysis of feed samples from the Circle J and his examination of the cattle. It is the sufficiency of that inspection that is at issue here. Mr. Scott testified that the month before the trial he spent about four hours at the Circle J, three of them looking at cattle. *Id.* at 639. During that visit, he observed 16 cows in the milking parlor and noted "some deformed hooves, some rough hair coats." *Id.* at 586. Then he and Mr. Thurman drove through the herd in a pick-up truck; Mr. Scott estimated that he saw, in this fashion, over 200 cows of the approximately 350–head herd, and that he stopped to examine more closely between 15 and 22 of the animals. *Id.* at 587. Again, the witness observed signs of lactic acidosis, including the hoof and coat conditions, as well as a deformity in the

---

... we shall continue to consider review ... but only in those cases where we are pressed to conclude that there is "plain injustice" or a "monstrous" or "shocking" result.[']" *Vanskike v. Union Pac. R. Co.,* 725 F.2d 1146, 1149–50 (8th Cir.1984), quoting *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447–48 (8th Cir.), *cert. denied,* 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961).

**11.** Defendants based their opposition to Mr. Scott's testimony about what he observed at the Circle J in part on the theory that his opinion about the herd's physical condition would represent the unauthorized practice of veterinary medicine, as defined in Ark.Stat.Ann. § 72–1133. The District Court called the objection "very clever and very ingenious" and overruled it. Tr. 584. We agree.

spinal column. *Id.* at 588. While this inspection, described by defense counsel as a "windshield appraisal," *id.* at 640, was certainly not so complete an evaluation as possible, the District Court was within its discretion to say it provided a sufficient basis for Mr. Scott's opinion to go to the jury. As the court told defendants' counsel, "[y]ou can argue that to the jury, that he has absolutely no basis for that, that he pulled it out of the air." *Id.* at 612. Jurors have enough sense to take such considerations into account during their deliberations.

■ On the issue of permanence of injury, the jury also had before it Ira Thurman's testimony that prior to use of the Harvestore system, his herd produced a daily average of at least 40 pounds of milk a day per cow, *id.* at 229, and that the daily tank average at the time of trial was less than 28 pounds per cow, *id.* at 291. He also testified that a cow producing less than 28 pounds is worthless as a milk cow, and therefore the cattle were reduced from their worth as milk animals to their slaughter value, *id.* at 248. As far as the plaintiff's use of the herd is concerned, this was permanent damage.[12] In connection with this testimony, the jury also knew that Mr. Thurman kept virtually no written records of his own, on either the health or milk production of the individual cows, and that he could not say which animals actually were producing less than 28 pounds of milk a day. *Id.* at 291. But this, too, is a question of credibility. There was sufficient evidence for the jury to award damages based on the diminished value of the Circle J herd.

The state of Ira Thurman's records, such as they are, is also connected to the defendants' challenge to any award based on lost milk production, since plaintiff sought profits allegedly lost through damage to a revenue-producing asset as well as compensation for the fact that the asset itself became less valuable for purposes of sale. According to defendants, not only was Circle J's milk loss a "hypothetical shortfall," Appellant's (AOSHPI) brief at 29, but plaintiff's evidence went only to lost revenue, and failed to factor in the cost of performance, as required by Arkansas law. *Robertson v. Ceola,* 255 Ark. 703, 501 S.W.2d 764, 766 (1973). And defendants once again note that Mr. Thurman's own actions could have contributed to any decrease in the herd's production.

■ There is no question that Mr. Thurman's evidence for lost milk production was homespun at best. He had records from the milk cooperative, and a production calendar kept by a farm hand, who received a bonus when the daily average went over 40 pounds per animal, as well as his tax records. As the District Court wisely noted, while even Mr. Thurman probably wishes his records were more complete, Tr. 231, the figures were adequately documented to raise a jury question. From that point, Mr. Thurman's records and recall are a question of credibility.

■ Nor was the milk-production evidence incomplete for failure to factor in cost of performance. *Robertson v. Ceola,* cited by defendants, involved a cost-plus contract; plaintiff there failed to show what portion of the amount allotted for labor represented the value of his own services on the project. Here, there is no indication that the cost of performance would differ whether the herd was producing under 28 pounds per day or over 40 pounds.

### IV.

■ Defendants claim that the District Court erred in submitting the deceit question to the jury, and that the District Court's post-verdict grant of their motion for judgment n.o.v. did not cure the error,

---

**12.** Although he hesitated to call it permanent damage, Dr. Lawrence Price, a consultant for defendant A.O. Smith Harvestore Products, Inc., testified that rumen acidosis could mean a cow's "milk production capability would be limited," and agreed with plaintiff's counsel that this would be "[f]or the life of the cow." Tr. 363.

because the jury's deliberations on the negligence claim were tainted by evidence of deceit that it ought not to have heard. We agree that there was insufficient evidence of deceit to make out a jury question.[13] The issue then is whether the evidence of deceit so tainted the case as to require that the verdict on plaintiff's other claim be set aside. The District Court, which has broad discretion in such matters, did not think so, and neither do we. The fraud evidence was ephemeral at best, based on allegations that first, Ira Thurman was told he would save considerably on feed costs (which, to a large extent, he apparently did) and, second, that representations of the system's worth and operation were made by a Southern Harvestore salesman who had minimal training.[14] This evidence is not sufficient to support submission of the fraud issue. Nevertheless, the error was harmless in context, because the evidence was also relevant to the plaintiff's negligence claim, and therefore would have been before the jury anyway.

In a case such as this, it is also possible that simply by the use of inflammatory terms "deceit" or "fraud," a party is prejudiced. At best, such a claim is speculative; in this instance, it is also unlikely. There seemed to be a striking lack of hard feelings present in the trial of this case, with both sides describing the principal actors of the other as nice fellows playing in the wrong leagues.[15]

Accordingly, the judgment is affirmed.[16]

13. For this reason, we reject plaintiff's argument, made on cross-appeal, that it is entitled to recover monies paid to Agristor Leasing, formerly a defendant, based on Restatement (Second) of Torts, §§ 531 and 552(b), on the theory that Circle J would not have owed Agristor but for the deceit of Southern and AOSHPI.

14. In fact, during closing argument, defendant's counsel described that lack of training as negligence, not as deceit.

15. Defense counsel stated that "no one here is mad at Ira Thurman. But ... ask yourself, is being a good 'ole [sic] boy enough to run a six hundred thousand dollar a year business corporation." Tr. 1015. Mr. Thurman's attorney had

previously said of the Southern Harvestore representatives:

> Rex Johns, I think, is a nice fellow. C.G. Mason, I think, is a nice fellow. I have no reason to think to the contrary. But you've heard Rex's background ... Rex has sold everything from mobile homes to encyclopedias.... But he was in way over his head [with the Harvestore system] and that's negligence.

*Id.* at 1005.

16. We also agree with the District Court that there was sufficient evidence to support the jury's apportionment of negligence as between the two defendants.