# United States Court of Appeals

## For the Eighth Circuit

_____

No. 20-2703

_____

Craig Shipp

*Plaintiff - Appellant*

v.

Kevin Murphy, Chief Deputy, Director, Individually

*Defendant - Appellee*

Kimberly Hoffman, Medical Administrator, Individually

*Defendant*

Steve Arnold, Warden, SW AR Community Correction, Individually; Lenora Turner, Medical Director, SW AR Community Correction Center, Individually; Dr. Mimo Lemdja, Employee/Contract Physical SW AR Community Correction Center, Individually

*Defendants - Appellees*

Nurse Melissa Stoner

*Defendant*

Kendall Smith, Nurse, Individually

*Defendant - Appellee*

Nurse Diane Cunningham

*Defendant*

John and Jane Doe Physicians, All unknown physicians and medical staff of SWACCC in Texarkana; John and Jane Doe Employees, All unknown employees of the SWACCC in Texarkana

*Defendants - Appellees*

Dr. Lorene Lomax, Employee/Contract Physician of SW AR Community Correction Center

*Defendant*

Correct Care Solutions LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: April 14, 2021
Filed: August 13, 2021

_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Inmate Craig Shipp filed federal claims under 42 U.S.C. § 1983 and state negligence claims against Southwest Arkansas Community Correction Center prison officials, medical staff, and a medical services company for withholding his prescription orthotic shoes. After some of the parties were dismissed or released from the case, the district court[1] granted summary judgment to the remaining

_____

[1]The Honorable Susan O. Hickey, Chief Judge, United States District Court for the Western District of Arkansas.

defendants. Shipp appeals the district court's ruling that excluded a part of his expert's opinion and the grant of summary judgment to the defendants on the § 1983 claims. We affirm.

I.

After he was convicted of a fourth DWI offense, Shipp was sentenced in state court to two years in prison and required to participate in the Modified Therapeutic Community Program at SWACCC. Shipp wore prescription orthotic shoes because of diabetes and related conditions—an amputated left toe and a degenerative joint disorder in his right foot called Charcot joint. When he reported to the county jail on January 31, 2016, his orthotic shoes were taken away from him. Shipp arrived at SWACCC on February 1 without the shoes.

Correct Care Solutions LLC, which SWACCC uses for all of its inmates' healthcare needs, did Shipp's intake assessment. Shipp did not have any blisters or sores on his feet, but he told the CCS intake nurse that he needed the shoes. She told him to write to the warden, and he immediately filled out a request for "[o]rthotic diabetic shoes for Charcot joint." App. 803. The next day Warden Steve[2] Arnold wrote back, "If you need special shoes you will need to go see Medical." *Id.* Shipp turned in a sick-call request form on February 3 for "[d]eformed [f]eet and toes due to Charcot joint . . . [and] diabetes." App. 583. He also spoke to Warden Arnold during his "walk-through" with inmates on February 6.

At Shipp's medical appointment on February 5, Kendall Smith, a licensed vocational nurse, evaluated his feet and noted that he had no sores on his right foot. But when she saw that he had an "open area about the size of a silver dollar with skin only attached by the corner" on his left foot, she asked Dr. Mimo Lemdja to

---

[2]The record refers to Steve Arnold as "Steven" or "Stephen," Kendall Smith as "Kindall," and Lenora Turner as "Lenore Philson." For clarity, we will use the spellings from the docket.

look at the wound.  App. 582.  The doctor removed excess skin, ordered an antibiotic, and instructed Shipp to notify his family to request his shoes, which he did.  Shipp also received a temporary elevator pass and returned daily for dressing changes.  Nurse Smith recorded these actions in her nursing note, but Dr. Lemdja did not write any documentation.  The Health Services Administrator, Lenora Turner, RN, later wrote that Dr. Lemdja "refused to document her interventions [that day] because . . . '[s]he didn't want her name in the chart because it was too much of a liability.'"  App. 970.  Dr. Lemdja saw Shipp again on February 9 for an intake physical.  She documented the wound on his left foot but did not include any information about a request for shoes.

Shipp submitted a second written request for the shoes on Friday, February 12, notifying the warden that he had an open wound on his left foot.  Warden Arnold forwarded the request to Administrator Turner the same day.  Two days later, a nurse noted that Shipp had developed a new blister on his right foot and referred him to a physician.  Administrator Turner received Warden Arnold's notification on Monday, February 15, and told Shipp that his request "must be addressed in a sick call [because] it has to be evaluated for medical necessity by the doctor."  App. 240.  The next day, Shipp saw a doctor who documented his medical need for the shoes and wrote an order to off-load his feet.  After the doctor wrote the order, Administrator Turner spoke with Warden Arnold, who got prison approval for the shoes that same day.  Shipp's family sent the shoes and he received them February 19.

The wound on Shipp's right foot did not heal and three months later he was hospitalized.  After six days, he was discharged to another correctional facility and released from prison in August.  Eleven months after his release, Shipp's right leg was amputated below the knee after a bone biopsy showed an infection in his right foot.

Shipp sued for deliberate indifference to a serious medical need in violation of his Eighth Amendment rights and state-law negligence.  In his first complaint, he named ten individual defendants, plus unknown SWACCC physicians, medical staff

and employees, and later added CCS. Several defendants were released or dismissed from the lawsuit, but Warden Arnold, Dr. Lemdja, Nurse Smith, Administrator Turner, and CCS remained.

Before trial, Shipp retained a "jail and medical" expert, Dr. Joseph William Wright. Dr. Wright prepared his report to a reasonable degree of medical certainty and was deposed according to the district court's scheduling order. Dr. Wright died after giving his deposition. Shipp requested and the district court granted him leave to find a substitute expert, limiting the expert's scope to opinions already expressed in Dr. Wright's report or deposition.

Shipp substituted expert Lori Roscoe, an advanced practice registered nurse certified as a nurse practitioner. When she submitted her report, it included new opinions expressed to a reasonable degree of nursing and administrative certainty. The remaining defendants moved to exclude the parts of Roscoe's report on Dr. Lemdja's actions and all new opinions. The district court denied Warden Arnold's motion to exclude, but granted motions from Nurse Smith, Dr. Lemdja, Administrator Turner, and CCS (the medical defendants).

The district court granted Warden Arnold's motion for summary judgment asserting qualified immunity. The medical defendants also filed motions for summary judgment. The district court granted each of those motions and then declined to exercise supplemental jurisdiction over the remaining state-law negligence claims.

II.

Shipp appeals the district court's order excluding portions of his substituted expert's testimony and the grants of summary judgment to the remaining defendants.

## A.

Shipp first argues that the district court erred in excluding parts of his substituted expert's opinion as (1) beyond the scope of her expertise; and (2) beyond the scope of Dr. Wright's previous opinions. And because he was not allowed to present those opinions, Shipp says that the district court erred in granting summary judgment to the medical defendants.

Trial judges are tasked with a gatekeeping role to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (citing Fed. R. Evid. 702). We review a district court's decision to admit or exclude expert testimony under an abuse-of-discretion standard. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). And we reverse only when we see "clear and prejudicial abuse of discretion." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (citation omitted). A district court abuses its discretion "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when the court, in weighing all proper factors, commits a clear error of judgment." *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 393 (8th Cir. 2016) (citation omitted) (cleaned up).

## 1.

Shipp first says that the district court should not have excluded Roscoe's opinion that Dr. Lemdja's "failure . . . to document about her interaction with her patient deviates from the standard of correctional healthcare." App. 116–17. The district court excluded this opinion because it was beyond the scope of an advanced practice registered nurse's expertise. Shipp claims that a nurse practitioner is just as qualified as a physician to compare Dr. Lemdja's work to the standard of care.

The district court erred by relying on Arkansas law to exclude Roscoe's opinion for the § 1983 action. For a state law claim, a federal court may look to state law to determine witness competency in a civil action, Fed. R. Evid. 601, but it must use federal law for admissibility of expert testimony. *Fox v. Dannenberg*, 906 F.2d 1253, 1255 (8th Cir. 1990) (addressing admission of an expert in a state wrongful death action heard in federal district court sitting in diversity); *see also Stowell v. Huddleston*, 643 F.3d 631, 635 (8th Cir. 2011) (applying Minnesota law to determine competency of a physician expert witness outside his area of expertise). For federal claims like § 1983, the Rule 601 state law analysis does not apply, and we use federal law. His § 1983 claim should have been weighed under the *Daubert* standard and federal law.

This error was harmless, though. Under the federal rules, "[t]he opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (quoting Fed. R. Evid. 702). "Rule 702 does require that 'the area of the witness's competence match[] the subject matter of the witness's testimony.'" *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (citation omitted). Roscoe's academic training, licensure, and scope of practice do not qualify her to opine on a physician's standard of care. She did not have sufficient "specialized knowledge [to] help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Roscoe's statement that she offered her opinions "to a reasonable degree of nursing and administrative certainty," App. 121, the fact that she was proffered as a "correctional nursing/healthcare expert," *Id.* at 110, and her conclusion that Dr. Lemdja's actions "deviate[d] from the standard of correctional healthcare" rather than the physician's standard of care, *Id.* at 116–17, support this conclusion.[3]

---

[3]We do not set a bright line rule that a nurse practitioner may never offer an opinion on a physician's conduct if the same standard of care applies to both. *Cf. Creekmore v. Maryview Hosp.*, 662 F.3d 686, 692 (4th Cir. 2011) (finding no abuse

Roscoe's opinion was also cumulative. Fed. R. Evid. 403. Her testimony paralleled two other experts: Dr. Wright (offered through the transcript of his deposition) and Dr. Jeffrey Stieve. These opinions were both given to a reasonable degree of medical certainty and considered by the district court at summary judgment. D. Ct. Dkt. 134 at 11. ("[E]ach opine that Dr. Lemdja's treatment of Plaintiff on February 5 and 9, 2016, violated the medical standard of care . . . ."); *see also Patterson v. State Auto. Mut. Ins. Co.*, 105 F.3d 1251, 1253 (8th Cir. 1997) (holding that excluding an expert's testimony was harmless error because it was cumulative to the rest of his statements).

2.

Shipp also appeals the district court's exclusion of Roscoe's opinions that went beyond the opinions of Dr. Wright's original report. Planning for a trial beginning October 21, the district court set a March 24 expert witness disclosure deadline, a May 10 rebuttal expert witness deadline, and a June 24 discovery deadline. When Dr. Wright died shortly after his deposition, the district court modified its scheduling order, but cautioned that the substituted opinion had to be "substantively similar and cannot be contrary to or inconsistent with Dr. Wright's opinions." D. Ct. Dkt. 86 at 5. Shipp did not object to this order or file a motion to reconsider. When Roscoe offered several opinions not offered by Dr. Wright, including nursing and administrative opinions, the district court excluded them.

District courts have "broad discretion in establishing and enforcing" scheduling orders, and a "schedule may be modified only for good cause and with

---

of discretion in allowing doctor to testify about nurse's conduct because doctor "regularly performs the procedure at issue . . . and 'the standard of care for performing the procedure is the same.'"). Nor do we say that a nurse may not recount first-hand observations of medical treatment. *See United States v. Withorn*, 204 F.3d 790, 796–97 (8th Cir. 2000) (admitting testimony of certified nurse midwife with relevant qualifications and experience who conducted survivor's sexual assault examination).

the judge's consent." *Petrone v. Werner Enters., Inc.*, 940 F.3d 425, 434 (8th Cir. 2019) (quoting Fed. R. Civ. P. 16(b)(4)). We review a district court's rulings on discovery and pretrial orders for "clear and prejudicial abuse of discretion." *Williams v. TESCO Servs., Inc.*, 719 F.3d 968, 976 (8th Cir. 2013) (citation omitted).

In *Petrone*, we reversed a trial court's decision to extend and modify an expert deadline under a Rule 16(b) progression order when the expert provided a materially different report after depositions revealed inadequacies in the original opinion. *Petrone*, 940 F.3d at 434 (Complying with court "deadlines is critical to achieving the primary goal of the judiciary: to serve the just, speedy, and inexpensive determination of every action.") (citation omitted) (cleaned up).

Here, the district court found good cause to allow Shipp to substitute his expert but did not allow expanded or new theories. Like the plaintiffs in *Petrone*, Shipp wanted to introduce opinions he gathered after the deadline had passed and depositions had been completed. The district court's subsequent grant of a joint motion to continue did not re-open discovery or allow for that expansion. Under these circumstances, we cannot say that the district court abused its discretion in excluding Roscoe's opinions when they went beyond the scope of the earlier expert report and deposition.

B.

Shipp next appeals the district court's grant of summary judgment to Warden Arnold. We "review[] de novo the grant of summary judgment, viewing the evidence most favorably to the nonmoving party." *Johnson v. Leonard*, 929 F.3d 569, 574 (8th Cir. 2019).

The Eighth Amendment's prohibition against cruel and unusual punishment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee

the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted) (cleaned up). "When the condition of confinement at issue relates to a prisoner's medical condition, 'a prison official violates the Eighth Amendment by being deliberately indifferent *either* to a prisoner's *existing* serious medical needs *or* to conditions posing a substantial risk of serious *future* harm.'" *Aswegan v. Henry*, 49 F.3d 461, 464 (8th Cir. 1995) (citation omitted). When the prisoner "alleges deliberate indifference to current existing health problems . . . the inmate must prove deliberate indifference to a serious medical need." *Id.* So to survive summary judgment, Shipp must show (1) "an objectively serious medical need"; and (2) that Warden Arnold "knew of and disregarded that need." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997).

Shipp's Charcot condition and diabetes were serious medical needs, so the objective prong is met. The subjective prong has two components: "[T]he evidence must show that the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015) (citation omitted). The undisputed facts, viewed in the light most favorable to Shipp, must show that Warden Arnold subjectively acted with a culpable state of mind such that he "actually knew of but deliberately disregarded those needs." *Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999). The mental state required is "akin to criminal recklessness." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009).

The record does not show that Warden Arnold actually knew of the risk to Shipp or knew that his conduct was inappropriate in light of Shipp's risk, at least not before February 16. Before then, Warden Arnold only knew that Shipp asked for his shoes: first on February 2, when he instructed Shipp to seek authorization from Medical; and second, after Shipp reminded him during his February 6 walk-through, when the warden again told him to see someone at CCS. When Shipp notified Warden Arnold on February 12 that the situation with his foot was worse, the warden personally referred his request to CCS. It wasn't until February 16, once Warden Arnold received the CCS physician documentation that the shoes were a medical

-10-

necessity, that the subjective prong was met. Then, with knowledge of the risk, Warden Arnold immediately got prison approval for Shipp's shoes. Shipp called his sister about the shoes the same day and he had the shoes three days later.

It is not deliberate indifference for a warden to have an inmate go to medical services for care and to rely on medical professionals to authorize preventative medical equipment. That is not to say that prison officials may unreasonably delay needed medical equipment by setting up bureaucratic roadblocks. *See Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (denying summary judgment for medical defendants who delayed adequate treatment for eight months and observing that "something appears wrong with the [prison's] dental care system"). But here, there is no evidence that Warden Arnold recognized the risk of harm in using standard prison shoes or knew that requiring that a doctor's authorization would put Shipp's health at risk.

## C.

Finally, Shipp appeals the grant of summary judgment to the medical defendants.

### 1. Dr. Lemdja

Shipp says that Dr. Lemdja's refusal to "enter any orders" on February 5 and her failure to write an order to offload Shipp's feet on either February 5 or 9 was deliberate indifference. But Shipp admits that the "sore on his right foot developed, at the earliest, on February 12th." Shipp Br. 27. Shipp alleges that Dr. Lemdja's February 5 deliberate indifference occurred when she was treating Shipp's *left* foot. And on February 9, before a wound on his right foot developed, she referred him to the chronic care physician, and a visit was scheduled the following week. Shipp argues that this "clearly evince[s] [a] wanton disregard for any serious medical needs." Shipp Br. 27 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)). But Dr. Lemdja's failure to recognize his need for specialized shoes or

-11-

offloading of his right foot does not make his subsequent blister, wound, and amputation over a year later an "inevitable or probable result[]," *Treen*, 759 F.2d at 1238 (citation omitted), or evidence that she "deliberately disregarded . . . a known risk to [his] health," *Vaughn*, 557 F.3d at 908 (citation omitted) (cleaned up). On this record, Dr. Lemdja's inaction does not rise to the level of criminal recklessness. *See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) ("For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence . . . .'") (citation omitted).

## 2. *Nurse Kendall and Correct Care Solutions*

Nurse Kendall did not ask the administrator for Shipp's shoes because she thought that the policy required a doctor's order first. Shipp sued CCS "under *respondeat superior* and upon those acts that are related to the policies, procedures and protocols implemented by the entity." Am. Compl., D. Ct. Dkt. 15 at 3. The district court granted summary judgment to CCS under each theory and Shipp does not, and cannot under our case law, appeal the vicarious liability ruling. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (holding that a government entity cannot be held vicariously liable for its agent's acts under § 1983). On appeal, Shipp only argues that "CCS had an unconstitutional order in place preventing its nurses from exercising their judgment based on a patient's needs by requiring a doctor's order for them to raise that concern." Shipp Br. 28–29.

Nurse Kendall saw Shipp on February 5, and Shipp's own expert testified that she acted properly by asking a doctor to look at his left-foot wound. Nurse Kendall testified that it "is not part of [her] job to order a medical device. That has to be ordered by a physician." App. 965. It is not Nurse Kendall's duty to go beyond her scope of practice as a licensed vocational nurse. No reasonable jury could find that her care was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1241 (8th Cir. 1997).

Because we see no constitutional violation in Nurse Kendall's actions, CCS's policy and practice cannot be unconstitutional as applied to Shipp. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *see also Keefe v. City of Minneapolis*, 785 F.3d 1216, 1227 (8th Cir. 2015) (holding a claim against a government entity was dependent on a plaintiff's §§ 1983 and 1981 claims).

### 3. *Health Services Administrator Turner*

Warden Arnold sent Shipp's request to Administrator Turner on February 12, a Friday, and she received it the following Monday, February 15. She responded the same day. Nothing supports Shipp's contention that Administrator Turner was negligent, much less grossly negligent or criminally reckless.

We do not think a reasonable jury would make the string of inferences that the separate opinion proposes to find that HSA Turner knew of substantial risk as early as February 1. Even if it did, we do not think it could find that HSA Turner's actions amounted to deliberate indifference. *Cf. Darrah v. Krisher*, 865 F.3d 361, 371 (6th Cir. 2017) (reversing grant of summary judgment for nurse and administrator who knew of serious medical condition and "fail[ed] to, at a minimum, ensure that [the inmate] was seen by an advanced-level medical provider" until two months after arriving in facility).

### III.

For the reasons above, we affirm the judgment of the district court.

KELLY, Judge, concurring in part and dissenting in part.

I concur in the court's decision to affirm the grant of summary judgment to Correct Care Solutions (CCS) and Nurse Kendall Smith and the order excluding Lori Roscoe's expert opinion and testimony. However, I disagree with the court's analysis of Roscoe's qualifications as an expert, and I dissent from the decision to

-13-

affirm the grant of summary judgment to Warden Steven Arnold, Dr. Mimo Lemdja, and Health Services Administrator (HSA) Lenora Turner on Shipp's § 1983 claims.

I.

As an initial matter, because I agree with the court that Roscoe's opinion as to Dr. Lemdja is cumulative of both Dr. Joseph Wright's and Dr. Jeffrey Stieve's expert opinions, I concur in the decision to affirm its exclusion. Nevertheless, I write separately because the court's reasoning on admissibility applies too stringent a standard for expert qualification under Federal Rule of Evidence 702.

The court asserts that Roscoe, a registered nurse practitioner, is unqualified to offer an opinion on a physician's standard of care. It is true that Rule 702 "require[s] that the area of the witness's competence match[] the subject matter" of their testimony, Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1101 (8th Cir. 2006) (cleaned up). But it also "envisions a flexible inquiry," United States v. Withorn, 204 F.3d 790, 796 (8th Cir. 2000) (cleaned up), that "does not rank academic training over demonstrated practical experience," Fox v. Dannenberg, 906 F.2d 1253, 1256 (8th Cir. 1990) (quoting Circle J Dairy, Inc. v. A.O. Smith Harvestore Prods., Inc., 790 F.2d 694, 700 (8th Cir. 1986)); see id. ("[A]n individual can qualify as an expert where he possesses sufficient knowledge from practical experience, even though he may lack academic qualifications in the particular field of expertise."). Determining whether a witness is qualified to testify as an expert on a particular subject requires a fact-intensive evaluation of their "knowledge, skill, experience, training, or education"—one that the district court did not conduct. Fed. R. Evid. 702. For example, a pediatric doctor is not automatically qualified, by virtue of their medical degree, to offer an expert opinion on the treatment of Charcot foot; similarly, Roscoe's training as a nurse practitioner, rather than as a medical doctor, does not necessarily *dis*qualify her from doing so. See, e.g., Withorn, 204 F.3d at 797 (nurse with special training in examining rape victims and experience providing emergency OBGYN care was qualified to provide expert testimony that survivor's injuries were probably caused by blunt trauma); Loudermill v. Dow Chem. Co., 863 F.2d 566,

-14-

568-70 (8th Cir. 1988) (toxicologist with no medical degree and who "was not specifically familiar with the relationship between halogenated hydrocarbons . . . and liver toxicity" was permitted to testify as to cause of plaintiff's liver cirrhosis because he had "extensive experience" working in hospitals, performing autopsies, and determining toxicological causes of death); cf. Creekmore v. Maryview Hosp., 662 F.3d 686, 692-93 (4th Cir. 2011) (medical doctor was qualified to offer expert opinion about the nursing standard of care for "the postpartum monitoring of high-risk patients with preeclampsia" because he regularly "provide[d] healthcare services in the same context" (cleaned up)).

Roscoe has substantial experience in correctional healthcare—as a clinician, educator, and administrator—as well as in diagnosing and treating patients with diabetes and other chronic illnesses. Her competence sufficiently matches the subject matter of her testimony: Dr. Lemdja's failure to document her interactions with Shipp and to order the special orthotics he needed. Cf. Robinson, 447 F.3d at 1101; see also id. at 1100 ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." (quoting 29 Wright & Gold, Federal Practice and Procedure: Evidence § 6265 (1997))). In my view, Roscoe's opinion as to Dr. Lemdja—while cumulative—was nevertheless admissible expert testimony. See Johnson v. Mead Johnson & Co., LLC, 754 F.3d 557, 562 (8th Cir. 2014) (noting Daubert's "call for the liberal admission of expert testimony").

II.

A. *Warden Arnold*

In concluding that Warden Arnold is entitled to summary judgment on Shipp's deliberate indifference claim, the court reasons that "there is no evidence that Warden Arnold recognized the risk of harm in using standard prison shoes or knew that requiring a doctor's authorization would put Shipp's health at risk" before he

-15-

received CCS documentation of medical necessity on February 16, 2016. In my view, the record does not support this conclusion.

First, though Shipp's February 1 request for "orthotic diabetic shoes for Charcot joint" may not have been detailed enough to allow Warden Arnold to recognize the substantial risk to Shipp's health, Warden Arnold referred that request to Medical the next day, and the evidence suggests that the follow-up gave him the requisite knowledge. Specifically, HSA Turner testified that whenever Warden Arnold referred an inmate request to Medical, she "always" engaged in a "close follow-up" with him about it, whether in person, on the phone, or by e-mail. D. C. Dkt. 103-2 at 21:1-23. Warden Arnold also testified that his usual practice was to follow-up with Turner about any referrals to Medical and that he communicated with her "a lot." D. C. Dkt. 122-2 at 36:13-21, 37:4-6. Though he could not remember the exact date he spoke to Turner about Shipp, he testified that he was "sure" he did. Id. at 36:13-21. And by the time Warden Arnold received the February 1 request, Shipp's intake notes reflected that a doctor outside the facility had already prescribed him orthotic shoes for his Charcot joint. Given Warden Arnold and Turner's practice of conferring about medical referrals, and viewing the record in the light most favorable to Shipp, a jury could reasonably infer that they knew of the substantial risk to Shipp's health around the time of the referral on February 2. See Coleman v. Rahija, 114 F.3d 778, 786 (8th Cir. 1997) ("The factual determination that a prison official had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious." (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994))).

Second, even if Warden Arnold did not know of the substantial risk to Shipp's health as early as February 2, the record—at least at this stage of the proceedings—indicates that he became aware of it around February 5 or 6. Shipp testified that five or six days after he arrived at the facility—around February 5 or 6—he talked to Warden Arnold about the condition of his feet and his need for orthotic shoes and asked whether the warden would allow the shoes inside the facility. D. C. Dkt. 105-1 at 121:7-122:16. It is worth noting that Shipp's right foot was visibly deformed at

the time (and depending on whether Warden Arnold saw Shipp before or after Dr. Lemdja treated him on February 5, Shipp's left foot was either in a bloody sock or bandaged). See D. C. Dkt. 111-1 at 6. Giving Shipp the benefit of all reasonable inferences, the record thus indicates that sometime around February 5 or 6,[4] Warden Arnold knew that Shipp faced a substantial risk to his health without orthotic shoes. See Dadd v. Anoka Cnty., 827 F.3d 749, 755 (8th Cir. 2016) (finding that prison deputies were aware of inmate's serious medical needs where inmate himself explained his condition and need for medication to each deputy).

We have held that "when personally confronted with the serious medical needs of a prisoner, prison officials cannot be deliberately indifferent to those needs by inaction." Schaub v. VonWald, 638 F.3d 905, 918 n.6 (8th Cir. 2011). Yet Warden Arnold's response on February 5 or 6 was, again, that this was "something [Shipp] need[ed] to address through Medical," D. C. Dkt. 105-1 at 122:13-14—even though it was obvious at that point that Medical had failed to resolve Shipp's first written request for orthotic shoes. Viewing these facts in Shipp's favor, Warden Arnold's inaction constitutes deliberate indifference to Shipp's serious medical needs. See Schaub, 638 F.3d at 918 (upholding district court's finding of deliberate indifference where prison administrator "never checked with the . . . medical staff . . . to determine whether [inmate] was receiving" treatment and "took no steps to acquire a pressure-relieving mattress" for him); see also Carswell v. Bay Cnty., 854 F.2d 454, 457 (11th Cir. 1988) (finding sufficient evidence of deliberate indifference by jail administrator who was aware of inmate's unmet "need for medical care" but "still did nothing significant to ensure that [inmate] received medical attention"); Hartsfield v. Colburn, 491 F.3d 394, 401 (8th Cir. 2007) (Bye, J., concurring in part and dissenting in part) ("[O]ur cases suggest the indifference is heightened when an

---

[4]Warden Arnold also testified that Shipp's family reached out to him more than once but he did not follow through on their request because "they were asking for something to be sent from home, which wasn't a normal practice." D. C. Dkt. 105-4 at 47:18-21, 71:16-25. Though Warden Arnold could not remember the date of these communications, it is reasonable to infer that they took place before Dr. Lomax explicitly asked him to allow the orthotic shoes inside the facility.

inmate communicates his distress directly, as he did, and prison officials fail to respond.").

As a general matter, it does not constitute deliberate indifference for a warden to refer a prisoner to medical services for treatment. But if the warden "knew that [the inmate's] serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable." Langford v. Norris, 614 F.3d 445, 460-61 (8th Cir. 2010). Viewing the facts in Shipp's favor, this is what Warden Arnold did. Under these circumstances, Warden Arnold could not "insulate himself from liability merely by passing [Shipp's] complaints on to someone else in the prison bureaucracy." Id. at 462; see also West v. Atkins, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody . . . .").

## B. *Dr. Lemdja*

As with Warden Arnold, Dr. Lemdja's inaction with respect to Shipp's Charcot condition also rises to the level of deliberate indifference.[5]

It is undisputed that Dr. Lemdja did not order any offloading for Shipp's right foot despite treating him on both February 5 and 9 and knowing that he had already been prescribed orthotic shoes. See Phillips v. Jasper Cnty. Jail, 437 F.3d 791, 796 (8th Cir. 2006) ("[T]he knowing failure to administer prescribed medicine can itself constitute deliberate indifference."). But as Dr. Lorene Lomax noted when she examined Shipp on February 16, it was "absolutely critical" to "off-load the pressure point on his feet" because "[i]f he gets a severe infection"—such as from a ruptured blister—"he is at high risk for amputation." D. C. Dkt. 111-1 at 17; see also D. C.

_____

[5]Though some of Shipp's arguments with respect to Dr. Lemdja focus on her treatment of his left foot—which is not the basis of his § 1983 claims—Shipp has separately raised a genuine issue of material fact as to whether Dr. Lemdja was deliberately indifferent to his serious medical needs as pertaining to his right Charcot foot.

-18-

Dkt. 105-6 at 1 (Turner noting in a February 16 email to Warden Arnold that Dr. Lemdja had said that Shipp "could lose his foot" without orthotic shoes). That risk was particularly high in Shipp's case because "[d]iabetics have a much higher likelihood of slow progression to healing," D. C. Dkt. 111-8 at 14:19-21, making it all the more crucial to prevent such blisters from developing in the first place. On this record, a jury could infer that Dr. Lemdja, by virtue of her medical training, knew the substantial risk that failing to order offloading would pose to Shipp as a diabetic with Charcot foot and disregarded it. Cf. Conley v. Birch, 796 F.3d 742, 748 (7th Cir. 2015) (finding that evidence supported inference of deliberate indifference where doctor failed "to provide appropriate precautionary treatment" by immobilizing inmate's hand); Arnett v. Webster, 658 F.3d 742, 753-54 (7th Cir. 2011) (concluding that inmate stated claim for deliberate indifference where medical defendants knew he had been prescribed medication for rheumatoid arthritis before arriving to prison yet still failed to order the medication or explore alternative treatments).

Notably, Dr. Lemdja did not provide any medical reason for her failure to order offloading. Cf. Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004) (finding that questions of material fact precluded summary judgment where there was evidence that doctor was aware of medical need but withheld treatment for nonmedical reasons). She also knew that the orthotic shoes could not enter the facility without Warden Arnold's approval and that she needed to write a separate order for the shoes (beyond any notation in Shipp's medical chart) in order for Turner to obtain that approval. See, e.g., D. C. Dkt. 124-5 at 30:7-14 (Dr. Lemdja testifying that only doctors—not nurses—can order medical devices); id. at 36:17-18 (testifying that "[u]sually, when we put orders in [for treatment], there's a separate order" required); id. at 31:19-21 (explaining that Warden Arnold had "to go through the protocol" to allow orthotic shoes in); cf. D. C. Dkt. 105-6 at 2 (February 16 order by Dr. Lomax requesting orthotic shoes); D. C. Dkt. 105-13 at 12:13-13:21 (Dr. Lomax testifying that her practice was to notify Turner directly whenever she needed Warden Arnold's approval faster). Despite this knowledge, the extent of the

medical care Dr. Lemdja provided Shipp for his Charcot foot was to tell him to ask his family to mail the shoes.

Given the severity of Shipp's condition—including his neuropathy, the prior amputation of one of his toes, and the progressive nature of Charcot foot—together with Dr. Wright's testimony that ordering offloading was the basic standard of care, a jury could conclude that Dr. Lemdja's failure—on two separate occasions—to order the orthotic shoes (or at least a temporary form of offloading) was not an exercise of medical judgment, but rather, deliberate disregard of Shipp's serious medical needs. Cf. Est. of Majors v. Gerlach, 821 F. App'x 533, 546 (6th Cir. 2020) ("Because of the progressive nature of MS, every day that [the inmate] did not receive treatment was a day that his disease continued without any intervention designed to slow or mitigate its effects.").

Finally, the record also belies the suggestion that Dr. Lemdja's conduct did not cause Shipp harm. On February 16, Dr. Lomax noted that "abnormal weight bearing due to acquired foot deformities and abnormal sensation due to neuropathy" was "limb threatening" for Shipp. The evidence also shows that the failure to offload a Charcot foot creates a substantial risk of blisters or ulcers forming, that Shipp's medical chart reflected no blisters on his right foot when he arrived at the facility on February 1, and that Dr. Lomax noted that such a blister had formed on February 16. The blister ruptured soon after and never healed, further complicating Shipp's diabetic Charcot condition. See, e.g., D. C. Dkt. 111-1 at 43 (noting on July 29, 2016 that Shipp had a "nonhealing diabetic right foot ulcer since February 2016"); id. at 64 (noting on June 27, 2017 that "continuing ulcer plantar surface of the right foot in the midfoot region. . . . has been unable to heal"). This alone is enough to show harm. See, e.g., Langford, 614 F.3d at 461 (concluding that facts established a violation of inmate's rights under the Eighth Amendment where "a lapse in treatment . . . led to, or perhaps merely exacerbated the effects of, a condition called 'Charcot foot'"). But in July 2017, Shipp's right foot was amputated due to this limb

threatening blister.[6]  Though there is evidence that Shipp was at times noncompliant with wheelchair use after his release, we must give him the benefit of all reasonable inferences at summary judgment.  See D. C. Dkt. 125-3 at 61:16-62:5 (expert witness Dr. Shawn Smith opining that once the sore developed, due to Shipp's condition and the "risk of breakdown" caused by the deformities, it likely "would not have made a difference" even if Shipp had "laid in bed for a year and a half"); see also id. at 62:7-11 (explaining that it was unlikely that any noncompliance by Shipp caused the amputation, especially given "everything that [the doctors] did to try to save his foot").  A jury could well conclude that Dr. Lemdja's inaction not only caused Shipp to develop a blister/ulcer and exacerbated his Charcot condition, but also resulted in the amputation of his right foot.  See id. at 59:15-19 (expert witness Dr. Smith testifying that if Shipp "had been given those orthotics, then he wouldn't have gotten than [sic] sore that led [to] that year and a half of care before he had his leg cut off").

Because I believe Shipp has raised trialworthy issues as to whether Dr. Lemdja's conduct "so deviated from professional standards that it amounted to deliberate indifference," Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990), I would reverse the grant of summary judgment to Dr. Lemdja.

## C. *HSA Turner*

The court concludes that Turner was not deliberately indifferent to Shipp's serious medical needs because when Warden Arnold forwarded her Shipp's second written request for orthotic shoes on Friday, February 12, 2016, she responded to it the following Monday, February 15.  This analysis overlooks Turner's inaction dating back to at least February 2 when Warden Arnold sent her Shipp's first request.

---

[6]Though Shipp had developed an infection in his Charcot foot after undergoing a biopsy in mid-June 2016, a jury could reasonably discount the biopsy as the cause of the amputation given that Shipp's medical providers were presenting (and at times recommending) amputation as a treatment option well before then.

Evidence in the record suggests that Turner knew as early as February 1 that Shipp had been prescribed orthotic shoes but that they had not been allowed into the facility. See D. C. Dkt. 111-1 at 1 (Nurse Nadia Brown noting at intake that she would relay this information to her supervisor); D. C. Dkt. 105-7 at 9:17-25 (Turner testifying that her role as HSA was to oversee nursing staff and administrative healthcare policies). By February 2, she also knew that Shipp had submitted a written request to Warden Arnold, that Warden Arnold had referred the request to Medical, and that Shipp had diabetes and Charcot foot. At this point, then, Turner was aware of Shipp's serious medical needs. And given her testimony that her usual practice when following up on inmate requests for medical devices was to check whether there was medical necessity, including by contacting the physician directly, D. C. Dkt. 105-7 at 13:19-14-5; D. C. Dkt. 103-2 at 21:1-18, a jury could find that she failed to do so in Shipp's case—despite knowing of the substantial risk to his health. Cf. St. Paul Park Refining Co. v. NLRB, 929 F.3d 610, 616 (8th Cir. 2019) (noting that circumstantial evidence of departure from past practice can support inference as to motive).

Moreover, and according to her own testimony, Turner's role as HSA was to act as a liaison between Medical and Warden Arnold: if an inmate needed a medical device from outside the facility, Turner was responsible for obtaining the warden's approval. See D. C. Dkt. 105-7 at 17:1-15; see also D. C. Dkt. 105-13 at 12:21-22 (Dr. Lomax testifying that "the HSA is our interface with the security and the warden's office"). Indeed, when the process to obtain Warden Arnold's approval finally started, it was Turner who emailed him to ask whether the shoes could be shipped into the facility. D. C. Dkt. 105-6 at 1. On this record, a jury could find that Turner knew that if *she* failed to coordinate the approval of Shipp's orthotic shoes, he would probably never get them. A jury could further infer that Turner's failure to act—despite understanding her essential role in the process and knowing that Shipp had previously been prescribed the shoes for his Charcot foot—amounted to reckless disregard of Shipp's serious medical needs. Cf. Darrah v. Krisher, 865 F.3d 361, 371 (6th Cir. 2017) (concluding that nurse—who was also the prison health care administrator—was not entitled to summary judgment on deliberate

-22-

indifference claim in light of evidence that she failed to relay important information to inmate's treating physicians).

III.

Because I believe genuine issues of material fact preclude a grant of summary judgment to Warden Arnold, Dr. Lemdja, and HSA Turner, I dissent from the court's ruling on Shipp's § 1983 claims against those individuals. I would also affirm the district court's order excluding Roscoe's expert opinion regarding Dr. Lemdja solely on the ground that it is cumulative. I concur in the court's opinion in all other respects.

_____