# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3777

_____

Brian Farrington

*Plaintiff - Appellant*

v.

Officer Steven Smith; Officer Nicole Sipes; and Officer James Storey

*Defendants - Appellees*

City of St. Paul; Sgt. James Falkowski; St. Paul City Attorney's Office; and Officer Jason Neubrand

*Defendant*s

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 16, 2012
Filed: February 22, 2013

_____

Before LOKEN, SMITH, and BENTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Brian Farrington brought a claim under 42 U.S.C. § 1983 for, *inter alia*, excessive force against Officer Steven Todd Smith, Officer James Storey, and Officer

Nicole Sipes of the St. Paul, Minnesota Police Department. Farrington alleged that Officer Smith used excessive force against him and that Officers Storey and Sipes failed to intervene or protect Farrington from Officer Smith's use of excessive force. The district court[1] granted summary judgment to Officers Storey and Sipes on Farrington's failure-to-protect claim. Following a trial on Farrington's excessive-force claim, the jury returned a verdict in favor of Officer Smith. The district court subsequently denied Farrington's motion for judgment as a matter of law; motion for a new trial; and motion to vacate, modify, or amend the judgment. On appeal, Farrington argues that the district court erroneously granted summary judgment to Officers Storey and Sipes on his failure-to-protect claim. He also asserts that the district court erred in denying him a new trial on his excessive-force claim because the court (1) erroneously permitted evidence of the police officers' mental impressions, (2) erroneously permitted evidence speculating that a cell phone could be "weaponized," and (3) gave a faulty excessive-force jury instruction. We affirm.

## I. *Background*

Farrington attended a party that became disruptive at an apartment in St. Paul, Minnesota. Officer Smith responded to a 911 call from the party. Police dispatch advised him of an altercation between two males. Anticipating the police's arrival, Farrington waited in the street. When Officer Smith arrived at the apartment, he called for backup due to the crowd's size. Farrington greeted Officer Smith and asked, "What seems to be the problem, Officer?" Officer Smith responded, "What do you think the problem is?" Officer Smith inquired whether the apartment belonged to Farrington. Farrington explained that although his name was on the lease, he no longer lived in the apartment. Officer Smith described Farrington's appearance as "disheveled."

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

Farrington, along with a former roommate, again approached Officer Smith, who had been joined by Officer Sipes. Farrington, who was chewing tobacco, spit "several times" on the ground in the officers' presence. Farrington maintains that he spit on the street, while Officers Smith and Sipes assert that Farrington spit on the sidewalk. Officer Smith claims that he told Farrington that "it's a violation of the city ordinance, you can't spit on the sidewalk." According to Officer Smith, Farrington ignored the warning and spit on the sidewalk "[a]t least three" more times. Officer Sipes also contends that Farrington spit on the sidewalk three times in Officer Smith's presence. After the third time, Officer Smith escorted Farrington to his squad car, emptied his pockets, and placed Farrington in the back seat of the car. Officer Smith did not handcuff Farrington. Officer Smith advised Farrington that he was being detained, not arrested.

Farrington's version of the facts differed substantially. Farrington claims that Officer Smith said, "You do that one more f[***]ing time, I'm taking you out." According to Farrington, he did not spit again after the warning. Instead, Farrington testified that he responded, "What are you talking about? All I did was spit." Farrington asserts that Officer Smith then "grabbed [Farrington's] arm and pulled [him] in the back seat of the [squad] car."

Despite searching Farrington, Officer Smith did not discover Farrington's cell phone. While in the squad car, Farrington used his cell phone to call a friend. When Officer Smith returned to the squad car, he observed that Farrington had something in his hand. He noticed that Farrington was holding the object up to the left side of his head and that his hand "was moving around." According to Officer Smith, he did not know whether the object was a cell phone, a weapon, or a weaponized cell phone. Officer Smith was concerned that the cell phone could have been a weapon because he had read a training article through the St. Paul Police Department that specifically referenced the dangers of cell phones being "weaponized," that is, being turned into handguns or concealing razor blades.

Officer Smith testified that he opened the squad door with his left hand and reached in with his right hand to retrieve the object from Farrington. He claims that he gave Farrington a verbal warning before trying to grab the cell phone from Farrington's hand. In response, Farrington leaned away from Officer Smith. Officer Smith then reached for the cell phone with his right hand. Officer Smith claims that Farrington then grabbed Officer Smith and pulled him into the back of the squad car. According to Officer Smith, after Farrington pulled him into the squad car, he "[s]tarted fighting for [his] life." He "punched [Farrington] as hard as [he] could" "wherever [he] could hit." Officer Smith recalled hitting Farrington in the "[u]pper torso" and possibly "the head." It was dark in the squad car, and Officer Smith could not see. When Officer Smith started punching Farrington, Farrington fought back by "[p]unching [Officer Smith] and reaching for stuff on [Officer Smith's] utility belt." Officer Smith estimated that he punched Farrington "[a]round five" times. As Officer Smith was punching Farrington, Officer Smith warned Farrington "to stop or [Officer Smith] was go[ing] to spray [Farrington] with . . . Freeze Plus P." Thereafter, the back passenger door was opened. Officer Smith could not recall whether Officer Storey or Officer Sipes opened the door. Officer Smith was "able to get out." After the incident, Farrington informed Officer Smith "that he had some brain surgery." Farrington apologized for his conduct and asked Officer Smith "to give him a break." Officer Smith agreed to issue tickets to Farrington and did not arrest him. Although Officer Smith offered to transport Farrington to the emergency room, Farrington declined.[2]

By contrast, Farrington testified that Officer Smith opened the passenger door and "yanked" the phone away from Farrington. Farrington responded, "What the hell?" He then pulled himself backwards, grabbing the phone with both hands. According to Farrington, as Officer Smith grabbed the cell phone, he "almost instantly" struck Farrington's head with a flashlight. Farrington maintains that Officer

_____

[2]Following the altercation, a friend took Farrington to the emergency room.

Smith struck him with the flashlight at least twice on his left temple and above his left eye; thereafter, Officer Smith used his fist to hit Farrington on the left side of his head and face several more times. Farrington testified that he told Officer Smith to "[g]et the f[**]k off me, I just had brain surgery . . . Get off of me, get off of me you are going to f[***]ing kill me."

During the scuffle over the cell phone, Officer Sipes stood on the opposite side of the squad car. According to Officer Sipes, after Officer Smith reached in the squad car, she

> saw Mr. Farrington back up and then all of a sudden [she] could see Officer Smith coming down on top of him and Officer Smith had a very shocked look and [she] could see that Mr. Farrington had a hold of him and he was being pulled down into the back seat.

Officer Sipes witnessed Officer Smith punch Farrington and heard Officer Smith tell Farrington that "if [Farrington] didn't stop[,] [Officer Smith would] spray [Farrington]."

Officer Storey was also present during the altercation, approximately 15 to 20 feet away. He "determine[d] that there was a fight going on in the back of the squad car." He observed that the squad car was moving from side to side, Officer Smith was in the back seat, and Officer Smith's feet were hanging out. When Officer Storey "noticed there was something wrong," he went to help. He opened the passenger door and heard Officer Smith tell Farrington to "stop resisting or stop fighting, put your hands behind your back." Officer Storey then reached into the car and grabbed Farrington's arms to handcuff him.

Based on this incident, Farrington brought a claim under 42 U.S.C. § 1983 for, *inter alia*, excessive force against Officers Smith, Storey, and Sipes. Farrington

alleged that Officer Smith used excessive force against him and that Officers Storey and Sipes failed to intervene or protect Farrington from Officer Smith's use of excessive force. According to Farrington, he suffered a concussion and soft-tissue swelling on the left temporal region of his head as a result of Officer Smith's force. The officers moved for summary judgment, and the district court granted summary judgment to Officers Storey and Sipes on Farrington's failure-to-protect claim. As to Officer Storey, the district court concluded that "no reasonable juror could conclude that Officer Storey failed to protect Farrington" because no evidence existed "that the fighting continued after Officer Storey approached the car or that Officer Storey delayed in approaching the car." *Farrington v. City of St. Paul*, Civil No. 09–1838 (DWF/JSM), 2011 WL 843913, at *6 (D. Minn. Mar. 8, 2011) (unpublished). As to Officer Sipes, the court found that "no reasonable juror could conclude that Officer Sipes failed to protect Farrington" because no evidence existed "that the fighting continued after Officer Sipes opened the back door or that she delayed in reacting to the altercation." *Id.*

The district court denied summary judgment to Officer Smith, determining "that, viewing the evidence in the light most favorable to Farrington, a reasonable juror could conclude that Officer Smith's use of force against Farrington was unreasonable." *Id.* at *4.

The case proceeded to trial on Farrington's excessive-force claim against Officer Smith. The jury found in favor of Officer Smith. Farrington then moved for judgment as a matter of law; for a new trial; and to vacate, modify, or amend the judgment. The district court denied the motions. *Farrington v. Smith*, Civil No. 09–1838 (DWF/TNL), 2011 WL 5374443 (D. Minn. Nov. 4, 2011) (unpublished).

II. *Discussion*

On appeal, Farrington argues that the district court erroneously granted summary judgment to Officers Storey and Sipes on his failure-to-protect claim. He

also asserts that the district court erred in denying him a new trial on his excessive-force claim against Officer Smith. Farrington's failure-to-protect claim depends upon the merits of his excessive-force claim. We thus begin our discussion with Farrington's argument that the district court erred in denying him a new trial on his excessive-force claim.

## A. *Motion for New Trial*

Farrington argues that the district court erroneously denied his motion for new trial because the court (1) erroneously permitted evidence of the police officers' mental impressions, (2) erroneously permitted evidence speculating that a cell phone could be "weaponized," and (3) gave a faulty excessive-force jury instruction.

"We review the district court's denial of a motion for a new trial for abuse of discretion." *Two Rivers Bank & Trust v. Atanasova*, 686 F.3d 554, 563 (8th Cir. 2012).

### 1. *Evidence of Mental Impressions and "Weaponized" Cell Phones*

Prior to trial, Farrington moved to preclude Officer Smith from testifying about his mental state. The district court ruled that Officer Smith could testify that he punched Farrington as hard as he could after being pulled into the back of the squad car because he feared for his life. Farrington also sought to exclude any evidence that the cell phone that he had in the back seat of the squad car could have been weaponized. Farrington argued that "what Smith subjectively thought *could* be *possible* is not relevant. Just what he observed, and whether a *reasonable* officer faced with the same observations would have used force." The district court denied the motion.

During trial, Officer Smith testified that he did not remove the cell phone from Farrington before putting him into the back of the squad car because he "didn't know [Farrington] had one." Upon Officer Smith's return to his squad car, he "saw

[Farrington's] hand cuffed and it was up by his head and moving around." Officer Smith "could see an object in [Farrington's] hand." Officer Smith considered this "a huge problem" because he had previously frisked Farrington. Officer Smith "opened the squad door" and said "[g]ive me that."

Farrington's counsel inquired about Officer Smith's testimony that he did not know what object was in Farrington's hand. Farrington's counsel asked, "Were you implying it could be something dangerous?" Officer Smith replied, "Yes." When Farrington's counsel asked whether it "could have been . . . a gun," Officer Smith replied, "It could have been." Farrington's counsel also asked Officer Smith whether he was "concerned that [Farrington] could have a cell phone that had been retrofitted to be a weapon of some kind." Officer Smith responded, "When I noticed there was a cell phone, that was a concern." Officer Smith noticed the cell phone when he was reaching for the object and saying "give me that." Farrington's counsel also asked Officer Smith whether he thought "there was a weapon" or whether he thought that there "could have been a weapon." Officer Smith replied, "I had no idea what it was that he had in his hand."

Farrington's counsel questioned Officer Smith if he had ever "encountered a cell phone that had been turned into a weapon," and Officer Smith explained that he had seen pictures of them. When Farrington's counsel asked whether weaponized cell phones were infrequent, Officer Smith replied, "It is getting more frequent." Farrington's counsel then asked Officer Smith why he grabbed Farrington's cell phone, and Officer Smith replied:

> Once I realized it was a cell phone, there are several reasons. A), it could have been weaponized, made into a gun, knife. You can conceal things in cell phones, razor blades. Being hit with a cell phone would hurt a lot more than being hit without a cell phone, like with a slap or a punch. People can use cell phones to call other people up to call them over to a scene, which I have had happened in the past, especially with

party calls. The cops are almost done. Let's resume the party. Let's get going again, or all meet at this location. Or another example is, I am sitting in the back seat of a squad car. Come let me out.

When Farrington's counsel asked Officer Smith "[w]hat happened to the cell phone" when Farrington grabbed Officer Smith's hand and started pulling him, Officer Smith replied that he "ha[d] no idea" because he "was concerned about [his] life."

Officer Smith testified that during his struggle with Farrington, he felt tugging on his duty belt, which he interpreted as Farrington reaching for things on his belt. He felt this tugging on both sides of his belt. When Farrington's counsel asked Officer Smith to describe Farrington's resistance, Officer Smith stated:

I don't need to make it sound like he is an octopus, here, it is like mayhem. There is a fight. There is punching going on. It is not like—he is continually punching me in the chest like rapid punching, whatever. He is punching and reaching and it is just a bad situation.

Farrington's counsel asked Officer Smith, "How did you feel? Tell us what the emotions were when you fear for your life?" Officer Smith responded, "I was scared. I was petrified." He also said that he was "[c]oncerned, worried."

Thereafter, on direct examination, Officer Smith's counsel asked him to explain why he felt justified in retrieving Farrington's cell phone. Officer Smith testified:

Because at that point I did not know what was in his hand. And when I did realize that it was a cell phone, I still needed to confiscate it. Therefore, that is why I asked for it, give me that. And I reached for it immediately, because it needed to be recovered to find out.

When Officer Smith's counsel asked him to "explain why or why not you believed deadly force was involved at that time," Officer Smith replied:

> When I got into the fight with Mr. Farrington, at that point it is not about being fair. It turned to a point of, to me, life or death. If I would—if he would gain one of my tools, a weapon on my belt, there is no—there is no time-out, there is no "let's talk about this," it is over. And I felt very threatened. And we needed to solve this immediately and as fast as possible.

Officer Smith testified that he had received, as part of his St. Paul Police Department training, a 2003 bulletin entitled "For Your Safety: The Updated Book of Concealed or Unusual Weapons." He confirmed that according to this training bulletin, a cell phone could be turned into a stun gun, a hand gun, or used to conceal razor blades. Officer Smith testified that he had reviewed many similar bulletins on this issue. Likewise, Officer Sipes testified that her police training included issues such as weaponization of cell phones. Officer Sipes reviewed the 2003 bulletin and confirmed that it was a training bulletin that she read on the weaponization of cell phones.

On appeal, Farrington argues that the district court's permitting Officer Smith to testify about his mental impressions prejudiced Farrington's excessive-force claim. He asserts that "[o]fficer[s] are regularly permitted to testify that they took action to be 'safe' or 'for the safety of others,' or that they were in 'fear.'" He claims that plaintiffs, on the other hand, are prohibited from introducing evidence that the officer had an ill-motive or other mental-impression evidence. According to Farrington, under *Graham v. Connor*, 490 U.S. 386 (1989), the inquiry as to whether a police officer's use of force was "excessive" is governed by the objective-reasonableness standard; the question is whether the officer's actions were objectively reasonable in light of the totality of the facts and circumstances surrounding him, without regard to his underlying intent or motivation.

Based on *Graham*, Farrington contends that the district court should have precluded testimony that Officer Smith (1) thought that Farrington was going to hurt him, (2) thought that Farrington might go for his gun belt or that he might be doing something in the area of his gun belt, (3) thought that he was going to be or could be killed, (4) feared for his life, and (5) believed that Farrington could have a "weaponized" cell phone. According to Farrington, the district court's ruling left him no effective way to counter Officer Smith's subjective mental thought process.

"A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion." *Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010) (quotation and citation omitted).

We hold that the district court did not abuse its discretion in admitting any of the challenged evidence. First, much of Officer Smith's testimony regarding his purported "mental state" was elicited by Farrington's counsel. For example, counsel asked Officer Smith (1) whether Officer Smith was concerned that Farrington "could have a cell phone that had been retrofitted to be a weapon of some kind," (2) whether Officer Smith had ever encountered a weaponized cell phone, (3) why Officer Smith grabbed Farrington's cell phone, (4) why Officer Smith was not concerned about where the cell phone was during the altercation, and (5) what his emotions were when he feared for his life.

Second, all of the objected-to statements actually provide context for Officer Smith's conduct. Officer's Smith's descriptions of why he reacted in the manner that he did "form[ed] an integral part of [his] testimony" and "complete[d] the story" of the altercation. *United States v. De Oleo*, 697 F.3d 338, 344 (6th Cir. 2012).

Third, Officer Smith's concern about potential weaponization of the cell phone was not based on speculation. Officer Smith actually saw Farrington with a cell

-11-

phone. Officer Smith testified about his training and review of a 2003 bulletin on weaponized cell phones and that he had seen pictures of them. Officer Smith sought to retrieve Farrington's cell phone to determine to what extent, if any, it was weaponized. Further, Officer Smith's testimony also explains how even a non-weaponized cell phone posed a legitimate concern for officer safety. He testified that a cell phone could be used as a weapon to increase the hitting power of a possible assailant or to summon assistance.

Finally, the district court's jury instruction on excessive force advised the jury not to consider Officer Smith's "state of mind, intention, or motivation." *See infra* Part II.A.2. "Jurors are presumed to follow the court's instructions." *United States v. Patterson*, 684 F.3d 794, 799 (8th Cir. 2012).

## 2. *Jury Instruction*

The parties submitted joint proposed jury instructions to the district court. But Officer Smith did not agree to Requested Jury Instruction Number 16—"Excessive Force." That requested instruction recommended the *omission* of certain language contained in the Eighth Circuit Model Jury Instruction (Civil) 4.10. Requested Jury Instruction Number 16 reads, in relevant part:

> *whether a reasonable officer on the scene, without the benefit of 20/20 hindsight, would have used such force under similar circumstances. The jury must consider that police officers are often forced to make judgments about the amount of force that is necessary in circumstances that are tense, uncertain and rapidly evolving.* You must consider whether the officer's actions are reasonable in the light of the facts and circumstances confronting the officer, *without regard to the officer's own state of mind, intention or motivation . . . .*

Farrington argued that the italicized language

-12-

should not be contained in this instruction because it is Plaintiff's position that it misstates the law. On the one hand, the plaintiff has the down-side of not being able to show the bad motive of police, cannot show racism, sadism, "burnout" or other bad motive. Yet despite the law that the motive of officers is not to be considered, police are allowed to testify about being "afraid," or other things that they *claim* they *thought* were occurring, all of which are in the head of the officer. Plaintiffs cannot win with this instruction. Even the "rapidly evolving" part of the instruction gets at the *mental impression* of police. Yet plaintiffs cannot. So, Plaintiff cannot get inside the head of the officer, but the defense can. That instruction denies due process. If the "without regard to motive" clause is used, Plaintiff has offered some evidence to help balance the instruction.

The district court *did not* omit the language as Farrington requested, and the final jury instruction read, in relevant part:

In determining whether such force, if any, was "excessive," you must consider such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether a reasonable officer on the scene, without the benefit of 20/20 hindsight, would have used such force under similar circumstances. You, the jury, must consider whether Defendant's actions are reasonable in light of the facts and circumstances confronting the officer, without regard to the officer's own state of mind, intention, or motivation.

In his post-trial motion, Farrington argued that the district court erroneously gave the jury the model jury instruction, thus entitling him to a new trial. He asserted that

[t]he Model 8th Circuit jury instruction, which includes the language "you must consider that police are often asked to make decisions in tense and rapidly evolving situations" puts a thumb on the scale of justice, essentially telling the jury to resolve all doubts in favor of

police. That one instruction overwhelms all other instructions provide[d] to the jury. This makes it nearly impossible for a plaintiff to meet his burden.

Farrington also contended that the instruction tells the jury that "the police are *doing their job*," which he claimed was not factually accurate. Additionally, he stated that the instruction "does not leave the possibility that the police officer is: i) motivated by sadism (or anger, or hate); or ii) likes to create force situations so he can punch members of the public." And, he argued that "allowing police to discuss their positive subjective motivation (I was afraid, I was trying to protect the public), while prohibiting plaintiffs from discussing the negative motivation of the officer, prevents the plaintiff from winning the case."

In denying Farrington's motion for a new trial, the district court pointed out that it did not give to the jury "the portion of the instruction from Model Jury Instruction § 4.10 that [Farrington] f[ound] most objectionable"—the "rapidly evolving situation" language. *Farrington*, 2011 WL 5374443, at *2. The court determined that the given instruction was consistent with *Graham*. *Id*. at *3.

On appeal, Farrington argues that although the instruction tells the jury not to use the superior vision of hindsight in its evaluation, such instruction was ineffective because "the district court permitted . . . [O]fficer Smith to testify from his own hindsight 20/20—what he now, looking back, subjectively *thought* or *felt* about the incident." According to Farrington, if such evidence is introduced, an additional instruction is needed.[3]

---

[3]In Requested Jury Instruction Number 16, Farrington proposed that the district court instruct the jury that he had no duty to prove that Officer Smith had a bad motive and that if the jury found that Officer Smith had a bad motive, then it could consider the bad motive in addressing whether the use of force under the circumstances was excessive.

In reviewing jury instructions, we examine "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 711 (8th Cir. 2001) (quoting *White v. Honeywell, Inc.*, 141 F.3d 1270, 1278 (8th Cir. 1998) (internal quotation marks omitted)). We afford the district court "broad discretion in instructing the jury." *Ernster v. Luxco, Inc.*, 596 F.3d 1000, 1004–05 (8th Cir. 2010).

*Bady v. Murphy-Kjos*, 628 F.3d 1000, 1004 (8th Cir. 2011). District courts are not bound by the model jury instructions, but those instructions are "helpful suggestions to assist the district courts." *Id.* (quotation and citation omitted). "Jurors are presumed to follow the court's instructions." *Patterson*, 684 F.3d at 799.

We hold that the district court did not err in giving the model jury instruction because "the excessive force instruction [is] well-supported by law and appropriate given the evidence introduced at trial." *Bady*, 628 F.3d at 1004 (quotations omitted) (rejecting appellant's argument that "the excessive force instruction 'is a finger on the scale of justice in favor of police'" and that "district courts should receive more latitude in crafting excessive force instructions, particularly with respect to including the phrase 'rapidly evolving' derived from *Graham*"); *see also Billingsley v. City of Omaha*, 277 F.3d 990, 995–97 (8th Cir. 2002) (approving the submission of Eighth Circuit Model Jury Instruction (Civil) 4.10 for jury determination of an excessive-force claim under the Fourth Amendment's reasonableness standard).

B. *Failure-To-Protect Claim*

Farrington also asks this court to reverse the district court's grant of summary judgment to Officers Storey and Sipes on Farrington's failure-to-protect claim.

-15-

According to Farrington, although both officers were present when Officer Smith "beat" Farrington, neither officer attempted to help him.

Our conclusion that the district court did not err in denying Farrington's motion for a new trial on his excessive-force claim is dispositive of Farrington's failure-to-protect claim against Officers Storey and Sipes. To prove that Officers Storey and Sipes failed to intervene or protect Farrington, Farrington "must show, *inter alia*, that the officer observed or had reason to know that excessive force would be or was being used." *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011) (quotation and citation omitted). "Thus, [the jury's determination] that [Officer Smith] did not use excessive force is fatal to [Farrington's] claims that the remaining defendants unconstitutionally failed to intervene." *Id.*[4]

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

---

[4]Farrington also contends that "it was extremely difficult" for him to prevail against Officer Smith at trial on the excessive-force claim because Officers Storey and Sipes "were free to testify to support [Officer] Smith's story, without Farrington being able to show the jury that they, too, had something to lose by conforming their testimony to [Officer] Smith's [testimony]." Our review of the record reveals that Officers Storey and Sipes testified consistently with their deposition testimony. Thus, they did not alter or conform their testimony to Officer Smith's testimony at trial. Instead, they testified consistently with their deposition testimony, which they gave when they were named defendants. Ultimately, "[t]he jury was entitled to make a credibility determination, and it chose to believe [Officers Smith, Storey, and Sipes]." *Marez v. Saint-Gobain Containers, Inc.*, 688 F.3d 958, 964 (8th Cir. 2012).