# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3335
_____

Crabar/GBF, Inc.

*Plaintiff - Appellee*

v.

Mark Wright; Wright Printing Co.; Mardra Sikora; Jamie Frederickson; Alexandra Kohlhaas

*Defendants - Appellants*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: November 21, 2024
Filed: June 24, 2025
_____

Before COLLOTON, Chief Judge, BENTON and KELLY, Circuit Judges.
_____

KELLY, Circuit Judge.

After an eleven-day trial, a jury found defendants Mark Wright, Wright Printing Co. (WPCO), Mardra Sikora, Jamie Frederickson, and Alexandra Kohlhaas liable for trade secret violations and related claims brought by Crabar/GBF, Inc.

(Crabar). Defendants appeal the jury verdict and several of the district court's[1] pretrial and post-trial orders. We affirm.

I.

Prior to September 2013, WPCO manufactured various types of folders under the trade names Folder Express, Progress Publications, and Progress Publications Music. At all relevant times, Wright served as WPCO's President and Owner and Sikora served as WPCO's CEO. Also in the folder industry was Crabar, a subsidiary of a wholesale manufacturer and supplier of printed business products.

In September 2013, WPCO and Crabar entered an Asset Purchase and Sale Agreement (APA). Through this APA, WPCO agreed to sell its folder business to Crabar, including "all right and title to and interest in" "any and all customer lists, customer and prospect databases, customer sales information," and "any Intellectual Property owned by [WPCO] and used in the Business." WPCO also agreed not to disclose, for its or any other entity's benefit, the identity of its customers, or any of its confidential information, including "all trade secrets," and "information regarding the business of [WPCO], its manufacturing processes, methods of operation, products, financial data, sources of supply and customers." In exchange, Crabar paid WPCO $15 million. After acquiring WPCO's business, Crabar sold folders under the same trade names WPCO had used before the APA, and it operated out of a building owned and leased by WPCO.

In late 2015, after failed efforts to negotiate a longer-term lease with WPCO, Crabar moved its operations out of state, causing Crabar to lose 86 of its 90 employees. As a result, Crabar's sales dropped significantly in late 2015 and early 2016. Crabar's general manager testified that "things started to come together" in mid-2016, with "some more positive sales months."

---

[1]The Honorable John M. Gerrard, United States District Judge for the District of Nebraska.

Meanwhile, in mid-2016, WPCO launched a new folder business under the trade names "Pocket Folders Fast" and "Bandfolder Press." Without Crabar's knowledge—and despite the APA's terms—Wright had retained on his personal laptop "[h]undreds, maybe thousands" of excel spreadsheets containing folder-related sales data, customer lists, and other similar information. Using this historical sales data, WPCO identified Crabar's most popular products and then created an identical product line using WPCO's old design and manufacturing specifications. Crabar's general manager described WPCO's access to all of these customer files, sales data, and design specifications as having the "keys to the kingdom," because it allowed WPCO to "not only know what to produce, but [to] know how to produce it and [to] know who to produce it for or who to go back and target [with marketing]."

To aid in its new folder business, WPCO also relied on information from two former Crabar employees, Kolhaas and Frederickson. In May 2016, Kolhaas ended her employment with Crabar, but she retained 56 die template files[2] of Crabar's most popular folders and sent them to WPCO. After starting work with WPCO, Kohlhaas used the files as "a reference" when creating WPCO's new product line. Kohlhaas also retained a spreadsheet, referred to as the "die inquiry" spreadsheet. Kohlhaas sent the spreadsheet to Frederickson, who had left Crabar in 2014 and subsequently joined WPCO in January 2016. Frederickson admitted that this die inquiry spreadsheet had specific product information for over 4,500 of Crabar's products and described the spreadsheet as "incredibly useful."

Starting in July 2016 and going through January 2021, WPCO sold over $20 million worth of folders. Roughly 84 percent of WPCO's $20 million total sales from this period came from selling identical products compared to Crabar's top twenty highest selling products plus two other music folders.

---

[2]A die template file is used to print and position artwork on custom folders.

II.

Crabar sued WPCO, Wright, Sikora, Frederickson, and Kohlhaas for trade secret violations and other related causes of action. The case went to trial, and the jury found each defendant liable on each count, returning a verdict of just over five million dollars in compensatory and exemplary damages. After resolving post-trial motions, the district court entered a final amended judgment of roughly four million dollars,[3] comprised of $1,750,000 against Wright, $1,000,000 against WPCO, $1,250,000 against Sikora, $7,000 against Fredrickson, and $3,500 against Kohlhaas. Defendants appeal, challenging several of the district court's rulings during and after trial.

III.

A.

We begin with Crabar's breach of contract claim against WPCO based on the APA. WPCO argues the district court erred in denying its motion for judgment as a matter of law because, in WPCO's view, § 8.6 of the APA precluded recovery of the type of damages awarded by the jury. But the district court found that the final pretrial order—signed by Crabar and WPCO following the pretrial conference—did not identify WPCO's § 8.6 argument. See Fed. R. Civ. P. 16(d). Noting this omission, the district court denied WPCO's motion, concluding WPCO waived its argument.

We review a district court's denial of a motion for judgment as a matter of law de novo. Scott v. Dyno Nobel, Inc., 108 F.4th 615, 625 (8th Cir. 2024). We review a district court's enforcement of a final pretrial order—including the district court's determination of the pretrial order's scope—for abuse of discretion. See

---

[3]The jury awarded Crabar an additional $1,000,000 against Wright for breaching the APA, but the court set aside this award because Wright was not a party to the APA.

Hartis v. Chi. Title Ins. Co., 694 F.3d 935, 947 (8th Cir. 2012) ("[W]e will defer to the [d]istrict [c]ourt's construction of its own order." (quoting Brachtel v. Apfel, 132 F.3d 417, 420 (8th Cir. 1997))); see also Abellan v. Lavelo Prop. Mgmt., LLC, 948 F.3d 820, 830–31 (7th Cir. 2020) (reviewing district court's determination that contractual provision fell within final pretrial order's scope for abuse of discretion).

Under Federal Rule of Civil Procedure 16(d), "[a]fter any [pretrial] conference under this rule, the court should issue an order reciting the action taken. This order controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). Consistent with this rule, we have observed that "[t]he issues identified at the final pretrial conference and the agreements and stipulations made there are incorporated into the final pretrial order, which thereafter 'controls the course of the action.'" Klingenberg v. Vulcan Ladder USA, LLC, 936 F.3d 824, 830 (8th Cir. 2019) (quoting Friedman & Friedman, Ltd. v. Tim McCandless, Inc., 606 F.3d 494, 498 (8th Cir. 2010)). Issues not included in the order are ordinarily waived. Id. (quoting United States v. $84,615 in U.S. Currency, 379 F.3d 496, 499 (8th Cir. 2004)). We applied these principles in Klingenberg, where we held that the defendant waived its affirmative statute of limitations defense because the defendant failed to mention the defense during the final pretrial conference or argue for its inclusion in the final pretrial order. See id.

Here, WPCO failed to raise its § 8.6 argument at any point during the final pretrial conference, so the final pretrial order did not include it.[4] Nor did WPCO request for its § 8.6 argument to be included in the final pretrial order. The district court did not abuse its discretion in finding WPCO's § 8.6 argument fell outside the final pretrial conference order's scope, and therefore, as in Klingenberg, WPCO waived it.

---

[4]For the first time on appeal, WPCO argues Crabar waived its waiver argument. We decline to consider WPCO's new argument. See Gap, Inc. v. GK Dev., Inc., 843 F.3d 744, 748 (8th Cir. 2016).

WPCO counters that the principles set forth in <u>Klingenberg</u> should not apply here because WPCO's defense is based on a contractual provision, not an affirmative defense. This difference matters, WPCO asserts, because a party to the contract cannot claim to be "blindsided" as to the terms of a contract it drafted and signed. <u>See</u> <u>Caradigm USA LLC v. PruittHealth, Inc.</u>, 964 F.3d 1259, 1279 (11th Cir. 2020) (explaining that one of the purposes of pretrial orders is "to avoid 'blindsid[ing]' the district court and opposing parties" (alteration in original)).

But Rule 16 contains no exception for breach of contract claims, and nothing about <u>Klingenberg</u> suggests its holding was limited to affirmative defenses. To the contrary, we emphasized the final pretrial conference's role in "promoting efficiency and conserving judicial resources by identifying the real issues prior to trial." <u>Klingenberg</u>, 936 F.3d at 830 (quoting <u>Friedman & Friedman, Ltd.</u>, 606 F.3d at 498) (internal quotation marks omitted); <u>see also</u> Fed. R. Civ. P. 16(c)(2)(A) (including "formulating and simplifying the issues" as a "[m]atter[] for [c]onsideration" at pretrial conference). The issues identified in a final pretrial order inform the district court's scheduling, evidentiary, and other related rulings. The district court did not err in finding waiver and denying WPCO's motion for judgment as a matter of law.[5]

## B.

Next, we address Crabar's breach of contract claims against Frederickson and Kohlhaas based on the confidentiality agreements they signed when employed with Crabar. Frederickson and Kohlhaas argue the district court erred in denying their motions for judgment as a matter of law because, in their view, these agreements are not enforceable contracts.

---

[5]For this reason, the district court did not abuse its discretion in declining WPCO's requested jury instruction regarding § 8.6. <u>See</u> <u>Acad. Bank, N.A. v. AmGuard Ins. Co.</u>, 116 F.4th 768, 786 (8th Cir. 2024) (reviewing district court's refusal to provide jury instructions for an abuse of discretion).

"The interpretation of a contract is a question of law, reviewed de novo." Pac. Life Ins. Co. v. Blevins, 92 F.4th 734, 737 (8th Cir. 2024) (quoting Weitz Co. LLC v. MacKenzie House, LLC, 665 F.3d 970, 975 (8th Cir. 2012)). The parties agree that Nebraska law governs the interpretation of the contracts in dispute, so we apply Nebraska law. See Geico Gen. Ins. Co. v. M.O., 109 F.4th 1125, 1128 (8th Cir. 2024) (doing same for Kansas law).

Under Nebraska law, "[i]n order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty." Henriksen v. Gleason, 643 N.W.2d 652, 658 (Neb. 2002). "To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract." Acklie v. Greater Omaha Packing Co., 944 N.W.2d 297, 306 (Neb. 2020). "It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements." Id.

Here, the confidentiality agreements provide:

In consideration of my initial or continued employment by [Crabar] (The Company) . . . I understand and agree that confidential information is considered Company property, and may be used or disclosed only with proper authorization and in the exercise of my designated duties.

. . .

I understand and agree to abide by all of [Crabar's] policies and procedures at all times.

Based on the texts of the agreements, Frederickson and Kohlhaas promised they would not disclose confidential information without authorization, and they did so in exchange for their "initial and continued employment." This language is "definite and certain," and the parties mutually agreed to the terms. See Acklie, 944

-7-

N.W.2d at 306. Frederickson and Kohlhaas argue these agreements are "policies," not contracts, and point to language in the confidentiality agreements that they are "not a contract of employment." True, these agreements were not contracts for Frederickson and Kohlhaas's employment, but they were still agreements to keep Crabar's confidential information confidential. Frederickson and Kohlhaas also argue that the agreements "did not survive termination of employment," but this argument ignores that the agreements expressly state: "I shall *never*, either during my employment with the Company *or thereafter*, directly or indirectly use . . . confidential information acquired in the course of my employment activities." The district court did not err in denying Frederickson and Kohlhaas's motions for judgment as a matter of law.

C.

Next, defendants challenge the district court's denial of their motion for a new trial on Crabar's trade secrets claims under the federal Defend Trade Secrets Act. See 18 U.S.C. § 1836 et seq. We review for abuse of discretion. See Wash Sols., Inc. v. PDQ Mfg., Inc., 395 F.3d 888, 892 (8th Cir. 2005).

At trial, Crabar argued that defendants misappropriated six types of trade secrets: customer lists, customer information, sales and product cost modeling data, the Folder Express die inquiry spreadsheet, die template files, and die boards. The parties treat the latter three items collectively as the "folder information." The verdict form did not ask the jury to separately determine whether each of the six alleged trade secrets were indeed trade secrets. Instead, the jury was asked to decide only whether each defendant was liable on Crabar's "misappropriation of trade secrets claim." On appeal, defendants invoke the "general-verdict rule," arguing they are entitled to a new trial because it is impossible to tell whether the jury based its trade secret verdicts on the folder information (which defendants assert is not a trade secret), or on one or more of the other three alleged trade secrets (which defendants do not contest are trade secrets). See Friedman & Friedman, Ltd., 606 F.3d at 502 ("The rule in this circuit is clear that when one of two theories has erroneously been

-8-

submitted to the jury, a general verdict cannot stand." (quoting Dudley v. Dittmer, 795 F.2d 669, 673 (8th Cir. 1986))).

Defendants never asked the district court to provide a special verdict form. Nor did they challenge, at any point, the general verdict form issued by the district court. As a result, we are skeptical defendants have properly preserved their challenge. Cf. Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 800–01 (8th Cir. 1987) (upholding verdict that grouped together two theories of liability, where one was sufficient to sustain the damages verdict and defendant did not object to the verdict form's wording at trial). But we need not decide that question, because the evidence was sufficient for a jury to find the folder information were trade secrets.

"To demonstrate misappropriation of trade secrets, [Crabar] must show, among other things, the existence of a protectable trade secret and misappropriation of that trade secret." MPAY Inc. v. Erie Custom Comput. Applications, Inc., 970 F.3d 1010, 1016 (8th Cir. 2020). "A 'trade secret' is information that 'the owner thereof has taken reasonable measures to keep . . . secret' and that 'derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" Ahern Rentals, Inc. v. EquipmentShare.com, Inc., 59 F.4th 948, 955 (8th Cir. 2023) (quoting 18 U.S.C. § 1839(3)).

Here, the jury heard evidence that the folder information included a die inquiry spreadsheet. The jury also heard testimony that this spreadsheet contained information about various specifications, folder dimensions, gripper sizes, and other "incredibly useful" information "for pretty much every folder product that Folder Express had ever made." Additionally, the jury heard testimony that "nowhere is [the Folder Express die template inquiry spreadsheet] in the public space." In fact, Crabar's IT representative testified that the company's IT policies did not authorize employees to download or use die file information without express permission.

Furthermore, WPCO itself treated the folder information as confidential: prior to negotiating the APA, WPCO required *Crabar* to sign a non-disclosure agreement promising not to disclose various types of information, including the folder information. Based on this evidence, a reasonable jury could find that the folder information had independent economic value due to its secrecy and that Crabar took reasonable steps to protect the secrecy of its folder information. See 18 U.S.C. § 1839(3) (listing "compilations" as an example of a potential trade secret); see also AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 974 (8th Cir. 2011) ("Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required."). The jury heard WPCO's arguments to the contrary, but viewing the evidence in the light most favorable to the verdict, we cannot say that "there is a complete absence of probative facts to support the conclusion reached." Reach Cos. v. Newsert, LLC, 94 F.4th 712, 718 (8th Cir. 2024) (quoting Inacom Corp. v. Sears, Roebuck & Co., 254 F.3d 683, 689 (8th Cir. 2001)). The district court did not err in denying defendants' motion for a new trial on Crabar's trade secrets claims.[6]

D.

Before and after the jury verdict, Wright, WPCO, and Sikora moved for judgment as a matter of law on the tortious interference of business relations or expectancy counts. The district court denied the motions. Our review is de novo. Scott, 108 F.4th at 625. We apply Nebraska substantive law, Smith v. Toyota Motor Corp., 964 F.3d 725, 728 (8th Cir. 2020), recognizing we are bound by the decisions of the Nebraska Supreme Court. See Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010). If the court "has not decided an issue we must attempt to predict how [it] would resolve the issue, with decisions of [its] intermediate state courts being persuasive authority." Id.

---

[6]Because we decline to order a new trial on Crabar's trade secrets claims, we decline defendants' request for us to vacate the punitive damages and attorneys' fees associated with these claims.

"To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted." Thompson v. Johnson, 910 N.W.2d 800, 806–07 (Neb. 2018). On appeal, Wright, WPCO, and Sikora challenge the sufficiency of the evidence as to only the first element—whether Crabar had a valid business relationship or expectancy.

Neither party cites a Nebraska Supreme Court case squarely addressing this first element. But that court has cited favorably to a treatise, see Dick v. Koski Pro. Grp., 950 N.W.2d 321, 378 n.147 (Neb. 2020), which explains how to prove it: "[t]here must be a 'probability' of future economic benefit for the plaintiff or a 'reasonable expectancy' that the plaintiff and the third party will enter into a formal business relationship." 13 Business and Commercial Litigation in Federal Courts, § 138:33 (5th ed. 2024). When "there is no contract, the prospect of a beneficial economic relationship is necessarily a matter of some uncertainty," but "[w]here a business relationship is overly speculative, recovery is precluded." Id.; see also Summit Restoration, Inc. v. Keller, 953 N.W.2d 816, 824 (Neb. Ct. App. 2020) (approving unobjected-to jury instruction stating "a business expectancy may include a prospective contractual relationship if it was reasonably probable that the parties would have entered into a business relationship but for the unjustified interference").

Viewing the evidence in the light most favorable to the verdict, Scott, 108 F.4th at 625, the evidence was sufficient to prove this first element. Contrary to Wright, WPCO, and Sikora's contention, the evidence at trial showed more than past customer sales. The jury heard testimony that it was typical for manufacturers in the folder industry, like Crabar, to have repeat customers. Crabar's sales records bore that out: Crabar had thousands of repeat customers each year from 2013 through 2021. The jury also saw WPCO's sales records from 2016 through 2021, which

showed that many of Crabar's customers also simultaneously began ordering from WPCO throughout that time period. Relatedly, there was testimony that Wright, WPCO, and Sikora took Crabar's information, used it to develop identical folders, and then targeted Crabar's existing customers. Based on this evidence, a reasonable jury could find that Crabar had a probability of future economic benefit, a valid business relationship or expectancy, or a reasonable probability of entering into a business relationship, with its pre-existing customers absent Wright, WPCO, and Sikora's interference. The district court did not err in denying the motions for judgment as a matter of law on Crabar's tortious interference claims.

E.

We turn to defendants' argument that the district court improperly admitted expert testimony on damages, offered by Crabar, under Federal Rule of Evidence 702.[7] Over defendants' objection, Crabar's damages expert, a certified public accountant, Ron Bero, opined at trial about the lost profits Crabar suffered as a result of defendants' actions. To reach his conclusion, Bero relied on market data, interviews with Crabar employees, and sales numbers from both Crabar and WPCO. Bero based his lost profits calculations primarily on WPCO's past and future sales, but also on Crabar's past sales. Bero assumed that certain of WPCO's past and projected future sales represented sales that Crabar would have made absent unlawful interference. He testified that he then calculated Crabar's estimated past and future profits to a reasonable degree of accounting and financial certainty by determining Crabar's average profit margins based on Crabar's past performance. We review the district court's decision to admit this testimony for abuse of discretion. Shipp v. Murphy, 9 F.4th 694, 700 (8th Cir. 2021).

---

[7]The trial occurred in March and April of 2023, prior to the effective date of the 2023 amendments to Rule 702. "We apply precedents interpreting the *prior version* of the rule and do not decide whether our holding here would be the same if the amendments had been in effect at trial." Acad. Bank, 116 F.4th at 790 n.10.

Under Federal Rule of Evidence 702, expert testimony must meet three criteria: (1) "the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant"; (2) "the expert must be qualified to assist the finder of fact"; and (3) "the testimony must be reliable or trustworthy in an evidentiary sense." In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig., 9 F.4th 768, 777 (8th Cir. 2021). "In determining whether to admit a qualified expert's opinion testimony under Rule 702 . . ., the district court acts as a gatekeeper to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" Boehm v. Eli Lilly & Co., 747 F.3d 501, 507 (8th Cir. 2014) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993)).

"Generally, 'the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.'" David E. Watson, P.C. v. United States, 668 F.3d 1008, 1014 (8th Cir. 2012) (quoting Neb. Plastics, Inc. v. Holland Colors Am., Inc., 408 F.3d 410, 416 (8th Cir. 2005)). At the same time, while there is no requirement to consider every possible alternative explanation, an expert "must account for 'obvious' alternatives." Hirchak v. W.W. Grainger, Inc., 980 F.3d 605, 608 (8th Cir. 2020) (quoting Lauzon v. Senco Prods., Inc., 270 F.3d 681, 693 (8th Cir. 2001)). Courts should liberally admit expert testimony and resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility. See Masters v. City of Independence, 998 F.3d 827, 838 (8th Cir. 2021). Expert "testimony should be excluded only if it 'is so fundamentally unsupported that it can offer no assistance to the jury.'" In re Zurn Pex Plumbing Prod. Liab. Litig., 644 F.3d 604, 614 (8th Cir. 2011) (quoting Bonner v. ISP Techs., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001)).

On appeal, defendants do not challenge the factual accuracy of any underlying data—including WPCO's sales, Crabar's sales, and the other market information— that Bero relied on to reach his opinion. Nor do they challenge the factual accuracy of Bero's calculations or categorization of WPCO's sales. Instead, defendants argue Bero's testimony was unreliable because Bero's model made too many assumptions

-13-

about the predictive behavior of Crabar's customers and whether Crabar had the ability to produce the requested folders.

The fact that Bero's model relied on assumptions "cannot be sufficient to mandate exclusion; otherwise, expert testimony on lost profits would rarely be admissible because every model relies on assumptions and no model can account for every conceivably relevant factor." S&H Farm Supply, Inc. v. Bad Boy, Inc., 25 F.4th 541, 552 (8th Cir. 2022). Nor were Bero's assumptions so "fundamentally unsupported that it can offer no assistance to the jury." In re Zurn Pex Plumbing Prod. Liab. Litig., 644 F.3d at 614 (quoting Bonner, 259 F.3d at 929–30). For example, the jury saw evidence that Crabar had relationships with customers spanning nearly a decade, which supported Bero's assumption that Crabar's customers would have remained with Crabar. With respect to Crabar's ability to retain customers and keep up with customer demand, Bero's calculations of WPCO's sales began in July 2016. True, Crabar's sales declined significantly in early 2016, but Crabar hired and trained new employees during that time and saw its sales rise in the middle and later months of 2016. Thus, by the time Bero began calculating the sales, Crabar's operations had rebounded, at least in part, from the initial decline due to the move out of state.

Defendants also contend that Bero unreasonably assumed Crabar could capture WPCO's 24-hour turnaround sales. But Crabar's manager testified that Crabar *did* in fact offer 24-hour turnaround, and that in any event, "[i]t was pretty rare that somebody called with a kind of folder emergency[.]" Defendants also took the opportunity to challenge Bero's factual assumptions through a lengthy cross examination. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Acosta v. Acosta, 725 F.3d 868, 874 (8th Cir. 2013) ("[I]t is up to the opposing party to examine the factual basis for the opinion in cross-examination." (quotation omitted)). And their arguments on appeal go to how much weight to afford Bero's testimony, not to the testimony's admissibility. See In re Bair Hugger Forced Air

-14-

Warming Devices Prod. Liab. Litig., 9 F.4th at 777 (explaining the "general rule" that "deficiencies in an expert's factual basis go to weight and not admissibility").

Defendants also argue Bero's model improperly failed to account for the "head start rule," which "requires that a plaintiff may only recover money damages for a period until the defendant could have acquired the information by proper means, unless the plaintiff can demonstrate that damages beyond this period are justified." W. Plains, L.L.C. v. Retzlaff Grain Co., No. 8:13-CV-47, 2016 WL 165698, at *7 (D. Neb. Jan. 13, 2016) (citing Restatement (Third) of Unfair Competition § 45 (1995)). Defendants assert that Bero improperly assumed WPCO would *never* be able to enter the folder industry through lawful means, failing to account for WPCO's independent ability to enter the market.

But the jury's award was limited to lost profits Crabar experienced from mid-2016 through no later than January 2021. And Bero's assumptions with respect to WPCO's ability to enter the market through lawful means during this time period were not "fundamentally unsupported." Although Kohlhaas testified she could recreate a die template in ten to fifteen minutes, she was also impeached multiple times during her examination. The jury was free to reject her testimony, in full or in part. In any event, creating the die templates was only part of the process: defendants also used, in Frederickson's words, an "incredibly useful" template spreadsheet, suggesting the spreadsheet allowed WPCO to skip necessary steps in the design and manufacturing process to speed production. And defendants used various customer lists. A jury could reasonably conclude that it would take a significant amount of time and effort to recreate these lists, given the volume of information they contained.

Finally, we reject defendants' argument that Bero's model improperly failed to distinguish between unlawful and lawful conduct in calculating damages. Specifically, defendants assert that Bero's model included half a dozen former Crabar customers who were not on a list that WPCO had misappropriated, and thus defendants' sales to such customers would not be unlawful. But the record indicates

that at least three of these customers were indeed on a misappropriated list. And to the extent Bero's calculations—which were based on thousands of customers—included approximately three customers not included on a misappropriated list, this type of factual dispute was best left for cross-examination. Indeed, defendants specifically questioned Bero on this very issue.

The district court did not abuse its discretion in admitting Bero's testimony.

F.

Next, defendants argue the district court erred by refusing to amend the judgment or order a new trial to prevent Crabar from realizing double recovery. We review both decisions for abuse of discretion. See Estate of Petersen v. Bitters, 954 F.3d 1164, 1168 (8th Cir. 2020) (refusal to amend judgment); Wash Sols., 395 F.3d at 892 (denial of new trial). Defendants contend that Crabar's awards for breach of the APA, trade secret violations, and tortious interference claims are duplicative because they arose out of the same operative facts and were based on the same source of damages.

"[I]t is well established that '[a]lthough a party is entitled to proceed on various theories of recovery, a party is not entitled to collect multiple awards for the same injury . . . .'" Contitech USA, Inc. v. McLaughlin Freight Servs., Inc., 91 F.4th 908, 914 (8th Cir. 2024) (second alteration in original) (quoting EFCO Corp. v. Symons Corp., 219 F.3d 734, 742 (8th Cir. 2000)); see also Tolliver v. Visiting Nurse Ass'n of Midlands, 771 N.W.2d 908, 916 (Neb. 2009) (noting "a party may not have double recovery for a single injury or be made more than whole by compensation which exceeds the actual damages sustained"). Recognizing this principle, the district court repeatedly instructed the jury not to allow double recovery. First, the jury instructions specifically instructed the jury that "the law does not permit an injured party to recover more than once for the same injury." Second, the verdict form repeated this instruction when the form asked the jury to indicate the amount, if any, by which the jury intended to reduce the award for the various

-16-

causes of action "to prevent Crabar from recovering more than once for the same injury." And third, the district court, when reviewing the verdict form, confirmed with the jury in open court each damage award against each defendant, specifically addressing the issue of double recovery. We must presume the jury followed these repeated instructions. See Farrington v. Smith, 707 F.3d 963, 970 (8th Cir. 2013); Sloan v. Motorists Mut. Ins. Co., 368 F.3d 853, 856 (8th Cir. 2004).

The evidence at trial did not undermine this presumption. Rather, the jury heard evidence that the defendants misappropriated trade secrets, tortiously interfered with business relationships or expectancies, and breached the APA based on a variety of potential acts, which in turn could result in differing harms. Specifically, the jury heard evidence about WPCO improperly acquiring and using multiple customer lists, 56 different die templates, folder specifications, and hundreds or even thousands of spreadsheets, including the Folder Express die template spreadsheet. Any number of permutations could justify the jury's separate awards for each cause of action. Bero's calculations also separated out the sales for each year, each product, and for each individual customer. Thus, the jury had the underlying data to assess Crabar's various claims separately to avoid double recovery. See Matrix Grp. Ltd. v. Rawlings Sporting Goods Co., 477 F.3d 583, 592 (8th Cir. 2007) (explaining that courts must "'reconcile and preserve whenever possible' a jury verdict" (quoting Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995))). And the jury largely awarded different amounts on the different claims. See Landmark Infrastructure Holding Co. v. R.E.D. Invs., LLC, 933 F.3d 906, 910 (8th Cir. 2019) ("[T]hough not dispositive, the fact that the jury awarded different amounts on each claim suggests that the jury did not intend to duplicate the award."). The district court did not abuse its discretion.[8]

---

[8]To the extent defendants assert the jury improperly applied vicarious liability, we decline to consider this argument because they (1) failed to object to the jury's award before the jury was discharged, see Olsen as Tr. for Xurex, Inc. v. Di Mase, 24 F.4th 1197, 1204 (8th Cir. 2022) (explaining "[a] party waives any objection to an inconsistent verdict if she fails to object to the inconsistency before the jury is discharged" (quoting Williams v. KETV Television, Inc., 26 F.3d 1439, 1443 (8th

## G.

Next, defendants argue the district court erred in denying their motions for judgment as a matter of law, or alternatively for a new trial, because the evidence was insufficient to establish causation. Specifically, defendants assert that Crabar failed to link defendants' actions to Crabar's damages. But the jury was presented with evidence that defendants targeted Crabar's customers using Crabar's customer lists, and that the targeting worked. Sikora admitted that WPCO used Crabar's customer lists to identify potential customers and solicit sales; that she and her staff used Crabar's customer lists to conduct "initial outreach" by phone and email; and that WPCO was "having an incredible success rate" from these efforts. And Bero testified that from July 2016 to January 2021, roughly 84% of WPCO's sales came from selling a folder with identical dimensions to Crabar's top selling folders.

Notably, the jury also had access to both WPCO and Crabar's sales numbers and could cross reference those with customer lists WPCO took from Crabar. And it had information about Crabar's initial struggles in 2016, as well as Crabar's upward trajectory starting in the summer of that year. The jury had access to sufficient data and information to conclude defendants caused Crabar to lose customers. The district court did not err in denying defendants' motion for judgment as matter of law regarding causation, nor did it abuse its discretion in denying defendants' motion for a new trial.

For the same reasons, the district court did not abuse its discretion in denying a new trial based on excessive damages. See Estate of Snyder v. Julian, 789 F.3d 883, 888 (8th Cir. 2015) (standard of review; state law applicable to damages for state causes of action). The jury's awards are not "so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record," de Vries v. L&L Custom Builders, Inc., 968 N.W.2d 64, 86 (Neb. 2021)

---

Cir. 1994))), and (2) failed on appeal to cite legal authority on the applicable principles of vicarious liability, see Heuton v. Ford Motor Co., 930 F.3d 1015, 1023 (8th Cir. 2019).

-18-

(Nebraska's standard), nor do the jury's awards represent a "'plain injustice' or a 'monstrous' or 'shocking' result." <u>Eich v. Bd. of Regents for Cent. Mo. State Univ.</u>, 350 F.3d 752, 762–63 (8th Cir. 2003) (quoting <u>Jenkins v. McLean Hotels, Inc.</u>, 859 F.2d 598, 600 (8th Cir. 1988)) (Eighth Circuit standard).

IV.

We affirm.[9]

_____

---

[9]We have considered Appellants' motion for additional briefing and deny it.